## Staunton

RAVEN RED ASH COAL CO., INC., V. HERRON.

September 9, 1912.

Absent, Cardwell, J.

1. PRINCIPAL AND AGENT—*Agent's Power to Contract—Implied Powers —When a Question for the Jury.*—Whether or not a contract made by an agent for his principal, which was not expressly authorized nor subsequently ratified by the principal is binding on the principal, is dependent upon whether or not it was within the apparent scope of the authority of the agent to make such contract, and where the evidence on this subject is conflicting it is a question of fact to be determined by the jury, under proper instructions from the court.

2. EVIDENCE—*Declarations of Agent—Admissibility.*—Relevant declarations of an agent are, as a rule, admissible against his principal, provided they are within the scope of his authority and made in the course of the negotiation to which they refer, or in the discharge of his duty.

3. EVIDENCE—*Declarations of Agent—Admissibility.*—In an action against a corporation on a contract not authorized by the directors, the declarations of the agent of the corporation who made the contract, that the directors had approved and ratified it, not made when the contract was entered into, nor in the discharge of any duty, but in casual conversations not involving any business of the agency, are not admissible to prove ratification of the contract by the corporation.

4. CORPORATIONS—*Knowledge of a Director—Notice to Corporation.*—The information of two out of seven directors of a corporation, not communicated to the board of directors or to the other directors, that an agent of the corporation has entered into a contract on its behalf, which was not authorized, is not notice to the corporation of the existence of the contract.

5. PRINCIPAL AND AGENT—*Unauthorized Acts of Agent—Notice.*—In the absence of facts or circumstances sufficient to put a reasonably prudent man on enquiry, no duty rests upon a principal to make any effort to discover whether another is doing unauthorized acts in his name, and he has the right to assume, until other-

wise advised, that his agent will act within the scope of his authority. Notice is not to be imputed to a principal merely because he had reasonable opportunity to acquire knowledge.

6. DAMAGES—*Measure*—*Profits.*—The general rule in awarding damages is to give compensation for the pecuniary loss—to make amends or reparation for the injury inflicted. The plaintiff is entitled to recover all such damages as are the natural and proximate results of the wrongful act complained of. Ordinarily, a plaintiff will not be entitled to recover profits or expected gains, for they are generally conjectural and too remote. But if it be shown that the loss of profits or gains was the natural and proximate result of the wrongful act, and their extent is satisfactorily proved, they may be recovered.

7. DAMAGES—*Measure*—*Profits*—*Case at Bar.*—In an action by a contractor against a coal company for refusing to permit him to mine and deliver coal to a tipple, according to the contract, the measure of the plaintiff's damages is the difference between what he was to receive for delivering the coal to the tipple, as provided by the contract and the costs of doing it, and they are the natural and proximate result of the defendant's refusal to permit the plaintiff to perform his contract. Whether or not, in the case at bar, the plaintiff satisfactorily established what his profits would have been if he had been permitted to keep and perform his contract was a question for the jury, under proper instructions from the court.

Error to a judgment of the Circuit Court of Tazewell county in an action of assumpsit. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Harman & Pobst,* for the plaintiff in error.

*Bond & Bruce, W. H. Werth, S. D. May,* and *R. O. Crockett,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

H. J. Herron brought his action of assumpsit against the Raven Red Ash Coal Company, a corporation, to recover

damages for breach of a contract which the plaintiff alleged existed between him and the defendant corporation. Upon the trial of the cause there was a verdict and judgment in favor of the plaintiff. To that judgment this writ of error was awarded.

The grounds relied on for a reversal of the judgment are that McCorkle, who made the contract on the part of the defendant, had no authority to make it, either as the secretary and treasurer of the defendant company, or as superintendent of its mines; that the contract was of such a character that it could only have been made by the express authority of the board of directors; that no such authority was given to McCorkle, nor was his act ratified by the company; that if the contract were binding upon the company the damages sued for were not recoverable because of their uncertain and speculative character, and that, even if the plaintiff were entitled to recover any damages, the verdict of the jury could not be upheld because of errors of the trial court in the admission and rejection of evidence and in the giving and refusing of instructions·

It appears that McCorkle had been the secretary and treasurer of the company, and the superintendent of its mines, from its organization, in the early part of the year 1906, down to the first of October, 1908, when the contract in question was executed. His duties in neither of the capacities named were defined by any by-law of the company, or by any resolution of its board of directors, but he had charge of mines during that period, hiring its employees, mine foreman and powerhouse men by the month, motormen, track hands, blacksmiths and their helpers, brattice men and slate men by the day; coal cutters in different ways—by the ton, by the man, by the room and by the day; and coal miners by the ton. McCorkle, as superintendent, was employed by the month, and no one employed by him until the contract sued on was made was employed for

longer periods than one month.  The plaintiff, who had been in the service of the company for about one year as an electrician, was at first employed by the day and afterwards by the month, and knew the manner in which the work in the mine was being conducted when the contract sued on was entered into, which is in the following words:

"This agreement made and entered into this first day of October, 1908, by and between H. J. Herron, of Red Ash, Va., hereinafter called the Contractor, and the Raven Red Ash Coal Co., Inc., of Red Ash, Va., hereinafter called the Company; Witnesseth:

"Whereas, the said Company has this day let to contract all the day labor connected with the mining of its coal at Mine No. 1, at Red Ash, Va., viz., haulage of coal, cutting of coal, blacksmith and helpers, track men, brattice men, slate men on haulage ways and all other day labor incident to mining the coal, except as follows: power house and tipple labor.  Therefore, for and in consideration of the sum of thirty (30) cents per ton on a tonnage not to exceed 4,000 tons per month, and twenty-seven and one-half (27½c.) cents per ton on 500 tons in excess of 4,000 tons, twenty-seven and one-half (27½c.) cents per ton on a tonnage not to exceed 4,500 per month, and twenty-five (25c.) cents on 500 tons in excess of 4,500 tons per month, and twenty-five cents per ton on 5,000 tons per month and over, based on the present equipment, and should said Company put in more equipment, then the price paid said Contractor is to be reduced in proportion to increase of tonnage in excess of 6,000 tons.  Said Contractor is to remove only such slate as may fall on haulage ways.

"Said Contractor is to look after the mines in general, looking after the safety of the miners, so far as furnishing the necessary timbers and supplies is concerned; is to work

the mines in accordance with plans and specifications furnished by said Company.

"Said Company is to furnish all necessary supplies, including ties, props, and etc., but said Contractor (is to) keep up necessary repairs and to take props and ties into the mines when required.

"Said Contractor is to give special attention to all entries and to advance them as fast as possible. Said Company agrees to keep the time of said Contractor, time to be turned in every night, and to make payment to his men on regular pay-day.

"Said Company is to put in repair all the mine cars which are now torn up, but any cars damaged or torn up by said Contractor is to be repaired by him.

"Said Company is to allow said Contractor $50 in which to catch up with the track and trolley wire and other work which is now behind.

"Said Contractor is to use his judgment as to the necessary props required in a working-place, but must furnish sufficient props to protest (protect) the top.

"Said Contractor is to deliver the coal on the tipple at the above-named price per ton, and is to receive payment for same on the first Saturday after the 20th of each month, after deducting amount of labor chargeable against him on payroll and store.

"Said Contractor is to receive goods for his family use at 10 *per cent.* off of selling price, and is to have house rent and coal free, also such furniture as he now has in the house belonging to the Company, said furniture to be turned back to said Company at expiration of this contract.

"Said Contractor is to have full benefit of the present machinery now in use and any other machinery which the Company may purchase hereafter while this contract is in force.

"Said Contractor is not to dig, shoot or load any coal

or take any yardage under this agreement. Prices for shooting, loading or digging coal and yardage, under this agreement, is to be subject to the approval of the Company.

"This agreement is to be in effect for one year from date, unless otherwise cancelled by mutual agreement.

"Witness the following signatures this the day and year first above written.

"H. J. HERRON,

"RAVEN RED ASH COAL CO., INC.,

"M. R. MCCORKLE,

"Sec'y and Treas."

Prior to the making of the contract, the defendant had employed its own hands and had the work done itself, under its own supervision.

The plaintiff proceeded to perform the contract on his part, and did so for the months of October and November, 1908, when he stopped working, because, as he alleges, McCorkle refused to permit him to continue, or because, as McCorkle claims, the contract was cancelled by mutual agreement. The damages sought to be recovered are the net profits which the plaintiff claims he would have made during the remaining ten months of the year, if he had been permitted to keep and perform the contract as he was ready and willing to do.

It does not appear that McCorkle was specifically authorized by the board of directors to make the contract; neither does it appear that the contract, after it was entered into, was ratified at any meeting of the board. The contention of the plaintiff is that the defendant is bound by the contract, because it was within the authority, or apparent scope of authority, of McCorkle, as general manager or superintendent of the defendant's mines; or, if not, that the contract became binding upon the defen-

dant by its subsequent ratification or acquiescence in and receiving benefits under the contract.

Upon the question, whether the contract was within the authority or apparent scope of authority of McCorkle, as general manager or superintendent of the defendant's mines, the evidence was conflicting.  That question was submitted to the jury by three instructions, two offered by the plaintiff and the other by the defendant.

Instruction No. 1, given upon motion of the plaintiff, told the jury, among other things, that if they believed that McCorkle was secretary and treasurer of the defendant company and as such had charge and management of its mining operations, such as mining coal and hauling it to the tipple, the employment and discharge of men to do and perform the work in and about the defendant's mines, and that McCorkle was, in the making of the contract in question, acting within the general scope of his authority, then it was the contract of the parties.  By the plaintiff's instruction No. 5 the jury were told "that every delegation of authority or creation of an agency, unless the extent of such authority or agency be expressly limited, carries with it the power to do all those things which are necessary, proper and usual to be done in order to perpetuate the purpose of the agency, and embraces all the appropriate means necessary to accomplish the desired ends."

Instruction No· 1, given at the request of the defendant, told the jury, among other things, that if they believed from the evidence that McCorkle, as secretary and treasurer, or as superintendent of the defendant, had been placed in charge of the mining of the coal at the company's plant by its board of directors, without having his powers and duties defined, then he only had the right as such officer or agent to enter into such contracts as were usual and necessary to carry on the said business, according to

general custom and usage of the coal mining business in that territory; and that, if they believed that the contract was a special and unusual one, then McCorkle, as such officer or agent, had no right to make the contract on behalf of the defendant.

It cannot be said, as a matter of law, that McCorkle, as manager and superintendent of the defendant's mines, did not have the authority to make for his company the contract sued on. Whether he did or not was for the jury upon the evidence. The said instructions given by the court upon that question fairly submitted that question to the jury.

The court, upon motion of the plaintiff, gave the following instructions to the jury:

2. "The court instructs the jury that if they believe from the evidence the writing offered in evidence, signed with the name of the plaintiff and defendant, the latter by M. R. McCorkle, secretary and treasurer, was in fact so executed; that said M. R. McCorkle was in fact the secretary and treasurer of said defendant company, and was also superintendent of such company, and as such had charge of the mine of said company, with full power and authority to have the coal mined and hauled to the tipple, to employ and discharge men; that it was not within the scope of the authority of said M. R. McCorkle to enter into such writing on behalf of said company and thereby bind said company; still, if the jury should believe from the evidence that said company, by acquiescing in and allowing him to so manage and control said mine, held out that said M. R. McCorkle had the right to bind said company by the writing filed in evidence; that the said plaintiff had the right to believe, and did believe, in good faith, from such holding out, that said McCorkle had the right to enter into said writing and bind the company, then you

are instructed that said company is bound by said writing and is liable as a party thereto."

3. "The court instructs the jury that if they believe from the evidence, that M. R. McCorkle was the secretary and treasurer of the defendant company on October 1, 1908, the date of the contract offered in evidence, and as such secretary and treasurer, executed said contract for said defendant company, and assumed to act as agent of said defendant company, without legal authority and in excess of his proper authority, and that said company knowingly received the profits and benefits from such contract and made payments to said plaintiff under said contract, then so securing said profits and benefits, and so making payments, or either of them, was a ratification of the contract and renders the defendant corporation liable as a party to it."

4. "The court instructs the jury that if they believe from the evidence that the plaintiff, H. J. Herron, entered into the contract in the declaration mentioned in good faith; that he was unaware of any defect of authority or irregularity on the part of M. R. McCorkle, who acted for the defendant as its secretary and treasurer, and that there was nothing to excite suspicion of such defect or irregularity, and that the plaintiff, in good faith, entered upon the performance of said contract with the acquiescence of said company, and that said company received or accepted benefits from said contract, then the defendant is bound by such contract, although you should believe such defect or irregularity in fact existed."

Each of these instructions is objected to because there was no evidence upon which to base them.

Five of the seven members of the board of directors testified that they generally attended the meetings of the board of directors; that this contract was never brought to the board's attention or discussed by it before or after

its execution, so far as they knew; that they had never seen the contract until after this action was brought; and three of them stated that they had never heard of it until after the controversy over it arose; and two of them, to whom McCorkle, the superintendent, testified that he had mentioned the contract after it was entered into, stated they had no recollection of the superintendent's ever mentioning it to them, or that they had ever heard of it until long after it was entered into. The minutes of the board of directors do not show that it was ever brought to the board's attention or considered by it. The only evidence tending to show that the board had ever considered it was the testimony of the plaintiff and Drake, a mine foreman, that McCorkle had said to each of them, after the contract had been made and work was being done under it, that the board of directors had approved or ratified it. The evidence of these witnesses as to what McCorkle said the board of directors had done was excepted to by the defendant, and its admission is assigned as error.

As one of the objections to the instructions under consideration is that there was no evidence upon which to base them, it will be necessary at this time to consider the admissibility of McCorkle's statement to these witnesses.

The general rule is that relevant declarations of an agent are admissible against his principal, provided they are within the scope of his authority and made in the course of the negotiation to which they refer, or in the discharge of his duty. *Va. & Tenn. R. R. Co.* v. *Sayers,* 26 Gratt. (67 Va.) 328, 350; *Reusch* v. *Roanoke Storage Co.,* 91 Va. 534, 537, 22 S. E. 358; *Lynchburg Traction Co.* v. *Booker,* 103 Va. 594, 50 S. E. 148; 1 Greenleaf on Ev., sec. 113; 1 Elliott on Ev., sec. 252; 16 Cyc. 1003.

Tested by this rule, the declarations of McCorkle were clearly inadmissible. They were not made when the contract in question was entered into, nor in the discharge of

any duty, but seem to have been made in casual conversations not involving any business of the agency, and were mere narratives of what the board of directors had done.

The case of *Lynchburg Traction Co.* v. *Booker,* 103 Va. 594, 604-5, 50 S. E. 148, is relied on to sustain the ruling of the trial court, but manifestly it does not do so. In that case it appeared that shortly after the accident the president of the lighting company went to a point at or near the scene of the accident, where was also the manager of the telephone company. "These men," said the president of the court in delivering its opinion, "were upon the scene of the accident, in the discharge of duties which devolved upon them as the officers of their respective companies; and the answer given to the question" (that the wire which did the injury was the wire of his company) "was, we think, admissible, not as a part of the *res gestae,* but because made by an officer in the performance of his duty."

There was evidence tending to show that two of the directors, shortly after the contract was entered into, were informed of its existence, and did not object to it. The information of these two directors, not communicated to the board of directors or to the other directors, as the evidence shows it was not, was not notice to the defendant of the existence of the contract. Nor does the evidence show that the defendant, with knowledge, acquiesced in what was done under the contract, or knowingly received any profit and benefit, or made any payments under it. All that was done under the contract in carrying out what it bound the defendant to do was done by McCorkle, without the actual knowledge of the defendant, so far as the record shows. Nor does it appear that there was any such change in the manner in which the work was being done in the mines after the contract was made as to give the defendant constructive notice of the contract. In operating the

mine before the contract was made, the defendant, through McCorkle, employed its own hands and controlled its own machinery. After the contract was made the plaintiff was the employer of a large number of the hands and controlled a large part of the machinery, but there was little, if anything, in the work itself to show that it was being done during the months of October and November under a management other than that by which it had theretofore been carried on.

In the absence of facts or circumstances sufficient to put a reasonably prudent man on inquiry, no duty rests upon the principal to make any effort to discover whether another is doing unauthorized acts in his name, and he has the right to assume, until otherwise advised, that his agent will act within the scope of his authority. Notice is not to be imputed to a principal by reason of the mere fact that he had reasonable opportunity to acquire knowledge. See 31 Cyc. 1256 and cases cited.

It is clear, we think, that there was not sufficient evidence in the case to justify or sustain a verdict upon the respective hypotheses of the said second, third and fourth instructions, and those instructions, for that reason, even if otherwise correct, should not have been given.

The action of the court in holding that the damages sued for, although profits, might be recovered, is assigned as error. The several grounds upon which the defendant insists that damages were not recoverable, even if the contract sued on bound the defendant, are that they were uncertain, speculative and contingent. Two specific grounds are relied on to show that the profits sought to be recovered were speculative and contingent, because the amount of coal that the defendant had the right to deliver at the tipple, under the contract, depended (1) upon getting sufficient cars to transport the coal, and (2) in finding a market for it, as the company was selling on the general market.

The trial court held that the amount of coal which the plaintiff had the right to deliver was not, under the terms of the contract, dependent upon either of the contingencies named, and refused to permit evidence to be introduced upon those points.

This construction of the contract, we think, was correct, and since those matters could not be considered by the jury, the evidence offered as to them was, of course, properly rejected. The general rule in awarding damages is to give compensation for the pecuniary loss—to make amends or reparation for the injury inflicted. The plaintiff is entitled to recover all such damages as are the natural and proximate results of the wrongful act complained of. Ordinarily, a plaintiff will not be entitled to recover profits or expected gains, for they are generally conjectural and too remote. But if it be shown that the loss of profits or gains was the natural and proximate result of the wrongful act, and their extent is satisfactorily proved, they may be recovered. *Burrus* v. *Hines,* 94 Va. 413, 416, 26 S. E. 875, and authorities cited; *Alleghany Iron Co.* v. *Teeford,* 96 Va. 372, 31 S. E. 525; *Grubb* v. *Burford,* 98 Va. 553, 559-60, 37 S. E. 4.

In this case the damages done the plaintiff by the defendant, if it was bound by the contract, was the difference between what the plaintiff was to receive for delivering the coal to the tipple, as provided by the contract, and the cost of doing it, and they were the natural and proximate result of the defendant's act. The compensation he was to receive was so many cents per ton on the coal, delivered by the month in the quantities named, the free use of the house in which he was living and the furniture then in it, coal for his family, and goods out of the store for his family at 10 *per cent.* off the selling price. There was evidence showing, or tending strongly to show, how much coal the plaintiff had delivered at the tipple

during the two months he worked under the contract and the cost of putting it there. It also appeared that about one month after he ceased working under the contract he obtained work elsewhere at $100 a month. This item was, of course, to be considered in ascertaining his damages, since it is clear, from the contract, that he was to give the work under the contract his personal attention. The contract fixed the amount per ton he was to receive for delivering the coal at the tipple. There was evidence showing the rental value per month of the dwelling house he was entitled to occupy during the year the contract was to continue. There was also evidence tending to show that the plaintiff's profits, during the unexpired ten months, would have been greater than they were during the two months he was permitted to work under it. Whether this was true or not, or whether the plaintiff had satisfactorily shown what his profits would have been, if he had been permitted to keep and perform his contract, were questions for the jury, under proper instructions by the court.

At the conclusion of its petition for a writ of error, the defendant assigns as error the action of the court in overruling its demurrer to the declaration. This assignment of error does not seem to be much relied on, and, if it were, the demurrer was properly overruled.

As the judgment must be reversed, the verdict set aside and the cause remanded for a new trial, the assignment of error, based upon the refusal of the court to set aside the verdict as contrary to the evidence, will not be considered, as the evidence will be different at the next trial.

*Reversed.*