## OWENS BOTTLE–MACH. CO. v. KANAWHA BANKING & TRUST CO.

(Circuit Court of Appeals, Fourth Circuit. April 1, 1919.)

No. 1688.

1. PRINCIPAL AND AGENT ⬤123(12)—AUTHORITY OF AGENT—GUARANTEEING DEBT OF ANOTHER.

Evidence *held* insufficient to establish authority of an agent to bind his principal by guaranteeing payment of the note of another.

2. PRINCIPAL AND AGENT ⬤190(1)—ACTIONS AGAINST PRINCIPAL—PROOF OF AGENT'S AUTHORITY.

In an action against a principal in respect of an act of an alleged agent, the burden is on plaintiff to establish, not only the fact of agency, but that the act upon which he relies was within the agent's authority.

3. PRINCIPAL AND AGENT ⬤123(1)—LIABILITY OF PRINCIPAL TO THIRD PERSONS—AUTHORITY OF AGENT.

Authority of an agent to borrow money for his principal, or to obligate his principal to pay the debt of another, is not to be inferred, without clear evidence that it has been granted.

4. EVIDENCE ⬤75—INFERENCE FROM FAILURE TO PRODUCE.

That the party whose case is a denial, with the burden of proof resting upon his opponent, does not produce evidence within his reach, affords no ground for inference against him on the issue.

5. PRINCIPAL AND AGENT ⬤170(3)—UNAUTHORIZED ACTS OF AGENT—RATIFICATION.

A principal cannot be bound by the unauthorized act of an agent on the ground of ratification, because, when first informed of what the

---

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

agent has done, and called upon to be answerable therefor, he meets the demand with a general repudiation, which does not include an express denial of the agent's authority.

6. PRINCIPAL AND AGENT ☞137(1)—UNAUTHORIZED ACTS OF AGENT—ESTOPPEL OF PRINCIPAL.

That money borrowed by a building contractor was used in carrying out his contract, and thus went into the owner's property, does not estop him to repudiate an unauthorized promise of his agent to see that the loan was paid, of which he had no knowledge.

7. BANKS AND BANKING ☞154(9)—DEALINGS WITH DEPOSITORS—SPECIAL DEPOSIT.

Where defendant bank knew that a special account opened by plaintiff was for the purpose of advancing money to meet the pay roll of a contractor, who was constructing a building for plaintiff, and that the custom was for plaintiff, when a pay roll came due, to make a check on the account in favor of the contractor for the exact amount, which was used in meeting the pay roll, it cannot be held as matter of law that the deposit made by such a check was not a special deposit, which defendant would not rightfully apply on a note of the contractors.

In Error to the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

Action at law by the Owens Bottle-Machine Company against the Kanawha Banking & Trust Company. Judgment for defendant, and plaintiff brings error. Reversed.

Charles A. Schmettau, of Toledo, Ohio (Brown, Geddes, Schmettau & Williams, of Toledo, Ohio, and Brown, Jackson & Knight, of Charleston, W. Va., on the brief), for plaintiff in error.

Buckner Clay, of Charleston, W. Va. (George E. Price, of Charleston, W. Va., on the brief), for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

KNAPP, Circuit Judge. Plaintiff in error, plaintiff below, brought this action against defendant, Kanawha Banking & Trust Company, to recover the sum of $6,692.85, with interest from March 9, 1918, which sum is alleged to have been deposited with defendant on that day as a special deposit for a specific purpose, but which defendant wrongfully diverted to another purpose, as will presently be explained. Besides denying that the deposit was special, defendant pleaded a setoff of $15,000, being the amount of a note of M. Rabbitt & Sons Company, made on or about September 21, 1917, which it claims the plaintiff promised to pay. At the trial, and on the testimony relating to the cause of action set out in plaintiff's declaration, the court below directed a verdict for defendant, thereby holding in effect that as matter of law the deposit in question was not a special deposit. The evidence relating to defendant's set-off was submitted to the jury, with the instruction that, if they found for defendant, they should credit on the $15,000 the amount of the deposit sued for, and also a small balance which M. Rabbitt & Sons Company had in bank when that deposit was made. Under these rulings the jury returned a verdict in favor of defendant for $8,702.02, and plaintiff brings the case

here on writ of error. A more detailed recital of facts will disclose the questions to be decided.

Under date of February 20, 1917, the Owens Bottle-Machine Company, plaintiff, an Ohio corporation, having its principal place of business at Toledo, entered into contract with the firm of M. Rabbitt & Sons Company, also of Toledo, for the construction of a glass plant at Kanawha City, near Charleston, W. Va. The contract provided, among other things, "that the work shall be under the supervision and direction of the De Vore-McGormley Company," and "according to the drawings and specifications" furnished by that concern. The contractors shortly afterwards came to Charleston and commenced operations. March 16, 1917, they opened an account with defendant, which continued until March 9, 1918, the date of the last transaction here involved. Some time in the spring of 1917 plaintiff sent to Charleston one A. J. Martin, an employé, to assist the contractors "in the erection of the plant," as one of them says, and, as Martin himself says, "to check up the work on the construction of the plant at Kanawha City." Just what his duties were does not otherwise appear. He was the only representative of plaintiff continuously on the ground, though certain of its officials visited the plant "about every 30 days." Whether or not he had authority to pledge the credit of plaintiff, or to guarantee the payment by it of moneys loaned the contractors by defendant, is the vital question in the case.

We take up this question first, because for present purposes it may be assumed, as defendant contends, that, if plaintiff has been rightly charged with liability for the set-off of $15,000, it does not matter whether its deposit of March 9, 1918, was special or general, since it has received full credit for the amount in the verdict of the jury. What Martin did and the evidence of his authority will therefore be examined. On April 16, 1917, he opened an account with defendant in the name of "A. J. Martin, Cashier," which continued until March 9 of the following year. His deposits were all of small amounts, and the balance to his credit at no time more than a few hundred dollars. Aside from a transcript of this account, the record shows nothing relating to Martin until August 17, 1917, when he went with M. J. Rabbitt to defendant's bank and a loan of $5,000 was made to Rabbitt's firm. The business was transacted with the cashier, Mr. Lewis, whose testimony as to what took place is this:

"Mr. Martin came in with Mr. Rabbitt to see me in August, 1917, and a conversation took place in regard to negotiating a loan for $5,000. Mr. Rabbitt said that M. Rabbitt & Sons Company needed that much money, and Mr. Martin told me that if I would loan it he would see that it was paid, and in anticipation, as I was told, of the pay roll estimate due the Rabbitts. I loaned the money for 20 days. I took a note from the Rabbitts at that time, which was paid by M. Rabbitt & Sons later, 2 or 3 days after maturity, but charged to their account."

It is evident that the contractors were then embarrassed and that their financial condition soon became extremely serious. The next incident, and the most important, occurred on the 21st of September, when Martin again went to the bank with Rabbitt to negotiate an-

other loan. As the cashier was absent, they applied to the president, Mr. Staunton, who testified to the transaction as follows:

"Well, he came in with Mr. Rabbitt, and they jointly explained the reason of their coming, that they wanted to borrow—wanted to get $15,000 for M. J. Rabbitt & Company; and I called Mr. Martin to one side and said, 'Mr. Martin, we haven't got enough information about M. J. Rabbitt & Sons Company to extend any loan of this size; we cannot make the loan unless your company will pay it;' and he says, 'It is due them, or will be due them, within this month's estimate, and we will see that it is paid;' and I said, 'All right, we will let them have the money; that is, $15,000.' The advance was then made on the note of M. Rabbitt & Sons, and the proceeds of the note credited to their account. I took a note from M. Rabbitt & Sons Company, which was made out by some one else in the bank. That was all the conversation that occurred at that visit, so far as I recall it. I know nothing about the renewal of the note personally. The original note was never paid."

[1] In view of this testimony, it is to be taken for granted that Martin made the promise on which defendant relies; his authority to make it is, as already said, the vital question. Prior to the date of this loan to the contractors, though just when is not shown, plaintiff in its own name opened an account with defendant and deposited large sums from time to time. Checks on that account were drawn only at Toledo, and the bank knew that Martin had no authority to check against it. Later, when plaintiff was obliged to advance considerable sums for pay rolls and the like, in order to keep the construction work going, another and separate account was opened in the name of "A. J. Martin, Special." This account was commenced on the 13th of October, and continued until the 9th of the following March, and it was upon this account that Martin on that day drew the checks which plaintiff claims were placed to the credit of the Rabbitt firm as a special deposit. Coming, now, to the proof of Martin's authority, we find after careful search only the following:

Martin himself, as a witness in support of plaintiff's cause of action, testified:

"I was employed by the Owens Bottle-Machine Company at Charleston from September or October, 1917, to March, 1918, to check up the work of the construction of the plant at Kanawha City."

M. J. Rabbitt testified:

"The only one who represented the Owens Bottle-Machine Company on the ground was Mr. A. J. Martin. * * * Martin never paid any estimates. The checks always came from Toledo. All matters of extras and allowances of extras under our contract we took up with the De Vore-McGormley Company, and they decided them. We took up nothing of the kind with Martin, except what he ordered to be done."

James E. Rabbitt testified:

"The Owens Company had a man to represent them there—Mr. Martin. I do not know what his duties were. He was sent there to assist us in the erection of the plant. They did not have any other man here continuously. Mr. Martin had men under him. Martin assisted us in everything we asked him to do. He ordered us to do some things. Mr. Cochrane, the factory manager of the Owens Company, told me he would send him down here to assist us. He was on the ground all the time while the work was going on. Some of the officials of the Owens Company were around here about every 30 days."

Staunton, defendant's president, testified:

"I know, and at that time [when the loan was made] knew, that Martin was employed by the Owens Bottle-Machine Company. So far as we knew, he was the only representative they had here, and he was engaged in work on the Kanawha City plant. * * * I don't know from my personal knowledge what Mr. Martin's duties were—only what I got from Mr. Martin and Mr. Rabbitt, that he was the representative of the Owens Bottle Machine Company. When I met these various officials of the Owens Bottle-Machine Company, I don't recall that I ever made any inquiry as to what Martin's standing was, or what his authority was."

[2, 3] In our opinion, this comes far short of proving that Martin, a mere employé, who appears to have been little more than an inspector, had authority to pledge the credit of plaintiff, or to bind it by his promise to pay the loan which defendant made to the contractors. It is of course an elementary rule of law that a person dealing with an alleged agent is bound to ascertain his authority, and that, when suit is brought against the principal in respect of an act of such agent, the burden is upon the plaintiff to establish, not only the fact of agency, but that the act upon which he relies was within the agent's authority. It is likewise elementary that the authority of an agent to borrow money for his principal, or to obligate his principal to pay the debt of another, is not to be inferred without clear evidence that it has been granted. 31 Cyc. 1395. In Exchange Bank v. Thrower, 118 Ga. 433, 45 S. E. 316, it is said:

"A power so perilous is not to be implied from acts which in other matters less hazardous might create an agency. It must be conferred in express terms, or be necessarily and inevitably inferable from the very nature of the agency actually created. So strict is the rule that it will not be presumed even from an appointment of one as general agent, unless the character of the business or the duties of the agent are of such a nature that he was bound to borrow in order to carry out his instructions and the duties of the office."

If this be true as to authority to borrow money for the principal, it is at least equally true as to authority to pledge the principal's credit, or to guarantee that the principal will pay a loan made at the agent's request to a third party. We need not further discuss the point. It is enough to say that the meager and inconclusive testimony above quoted, if it have any probative force at all, fails manifestly, as we think, to overcome the burden resting upon defendant, or to furnish that "clear evidence" of authority which the law in such case requires.

Holding, then, that the direct testimony, so to call it, was quite insufficient to prove Martin's authority, as seems also to have been the view of the learned trial judge, we turn to the other considerations which defendant here urges in support of the judgment; and these will be briefly reviewed, without reference to the distinction between ratification and estoppel, both of which are asserted.

[4] In the course of the oral argument it was suggested that Martin's authority was inferable from the fact that, though present in court, he was not called as a witness, and that plaintiff offered no testimony, on the issue raised by defendant's plea of set-off. The rule of law is otherwise. In Wigmore on Evidence, vol. 1, par. 290, subsec. 5, it is stated thus:

"The opponent whose case is a denial of the other party's affirmation has no burden of persuading the jury, therefore, until the burden of producing evidence has shifted, he has no call to bring forward any evidence at all, and may go to the jury trusting solely to the weakness of the first party's evidence. Hence, though he takes a risk in so doing, yet his failure to produce evidence cannot at this stage afford any inference as to his lack of it; otherwise, the first party would virtually be evading his legitimate burden."

[5] The defendant presses the proposition which is stated in its brief as follows:

"If the Owens Company knew the facts, and failed to repudiate the act of Martin, its failure to do so would amount to a ratification. This is especially so where such failure was the cause of the trust company's not getting the money from the contractors."

Now, despite the contrary inference urged by counsel, we discover nothing of record to show, or which would justify a jury in finding, that plaintiff had any knowledge of Martin's alleged promise until so informed by letter of defendant's cashier under date of November 28, 1917. The answer to this letter was written on the 3d of December by Assistant General Manager Biggers, who seems to have been the official in charge of the Charleston project, or at least fully familiar with it. He begins by saying:

"The statements contained in your letter of November 28th are indeed a surprise to us. Your version of this transaction is quite at variance with the information which we have received from time to time from Mr. Martin, and from Mr. Rabbitt himself. It is also very different from the impression which I received from your president, Mr. F. M. Staunton."

He then goes into some detail of his interview with Staunton at Charleston "about October 15th," and concludes as follows:

"We have a friendly interest in your institution and in the Rabbitt firm, and we certainly do not want to see you lose any money as the result of having assisted them financially; but we can see no grounds whatever for assuming that we are responsible for the payment of Rabbitt's note, or that we should at this stage of the negotiations assume such responsibility."

Several letters between the parties followed during the next three months, but it appears to us, and can scarcely be argued otherwise, that none of them contains anything more favorable to defendant than the passage just quoted from the first, and it therefore follows that the claim of ratification, so far as the correspondence is concerned, rests on the fact that Biggers in that letter did not expressly disavow the authority of Martin to promise that plaintiff would pay the Rabbitt note, but only made the broad assertion that he saw "no grounds whatever" for holding the plaintiff responsible. Taking all the circumstances into account, we are clearly of opinion that the mere failure of Biggers at the outset to deny specifically the authority of Martin furnished no basis for inferring that he did in fact have authority, or that plaintiff had ratified his act. It cannot be the law that a principal runs the risk of being bound by the unauthorized act of his agent, because, when first informed of what the agent has done, and called upon to be answerable therefor, he meets the demand with a general repudiation, which does not include some particular ground

upon which he disclaims liability. And so it has been held by courts of high standing. Droste v. Wabash R. R. Co., 153 App. Div. 160, 138 N. Y. Supp. 203; Brown v. Henry, 172 Mass. 559, 52 N. E. 1073. In the latter of these cases, both of which appear directly in point, it is said:

"The naked question is presented whether, if a principal, on learning of an unauthorized contract of an agent, repudiates it, giving a reason for so doing which proves to be without foundation, such repudiation is equivalent to an adoption of it. In the absence of anything beyond this to work an estoppel, we are of opinion that it is not."

In connection with this correspondence it seems to us that some significance attaches to the interview mentioned between Biggers and defendant's president. It occurred about the time the original Rabbitt note came due and was renewed for 30 days. Staunton admits that he made inquiry of Biggers as to the financial standing and credit of the contractors. If he then understood or claimed that plaintiff was obligated to pay that note by virtue of Martin's promise, as is now contended, it seems most surprising that he made no mention of it in the course of their conversation; and his explanation that he supposed Biggers knew all about it is by no means convincing. On the other hand, if Biggers was fully aware of what Martin had done, as defendant would have us believe, it is equally surprising, in view of what Staunton was asking him, that he did not allude to such an important transaction. The inference is not difficult to draw.

[6] But defendant further contends that Martin's promise was ratified, or that plaintiff is estopped from repudiating it, because it got and kept the substantial benefit of the loan in question. It appears to be the fact that most of the $15,000 was applied by the Rabbitts in payment of materials used or labor employed in constructing the Charleston plant. But all this they were bound to furnish under their contract, and for it they were paid the contract price before plaintiff had notice of Martin's alleged promise. As above held, there is no evidence that plaintiff had such notice until the receipt of defendant's letter of November 28th, and long before that any materials paid for out of the loan had been so incorporated in the building as to be incapable of removal. There was nothing then that plaintiff had not the contract right to keep, or that it had the power to surrender. To say in such case that plaintiff must be deemed to have ratified the unauthorized act of Martin, because it retained what it could not return, is to say in effect that there could be no repudiation of his act without giving up the $15,000. We cannot sustain the contention. In our judgment the rule of law applicable to the facts here presented is stated in Mechem on Agency, § 439, as follows, citing numerous cases:

"So, as has been stated, acceptance and receipt of the benefits must, to work a ratification, have been voluntary, and must find their warrant in rights flowing from the act. For, if the principal had no choice, if the benefits could not be separated from something to which he was in any event entitled, or if his act was not confirmatory, as where he would have been entitled to the same benefit independently of the act in question, the acceptance and receipt under such circumstances would not constitute a ratification."

Nor do we find any evidence, or even an attempt to show, that defendant was misled to its prejudice by the alleged failure of plaintiff, in Biggers' letter of December 3d, to repudiate the transaction on the ground of Martin's lack of authority. It is not perceived that defendant thereafter did anything, or refrained from doing anything, which resulted to its disadvantage, because Biggers did not in that letter explicitly deny the authority of Martin to guarantee for plaintiff the payment of the Rabbitt note. Defendant was perfectly aware from what Biggers wrote that plaintiff disclaimed responsibility for Martin's alleged act and refused to be bound by it, and defendant was then at full liberty to take any action it saw fit for the recovery of its loan to the Rabbitts. It is wholly unproven that defendant was misled or prejudiced in any respect by the position which plaintiff took, when first apprised of Martin's promise, or by its subsequent attitude. In short, we find no basis for the asserted estoppel.

Without argument or citation of decisions, we content ourselves with merely expressing the opinion that, if Martin's promise was authorized or afterwards ratified, it was in legal effect an original promise of plaintiff, and therefore not within the statute of frauds.

[7] Having reached the conclusion, for the reasons above outlined, that the evidence of record does not sustain the verdict for defendant on its plea of set-off, we return to the proofs in support of the cause of action set up in plaintiff's declaration. These proofs are to the following effect: In October, 1917, plaintiff commenced advancing money to the contractors for the payment of their bills and pay rolls, as heretofore stated, and for that purpose opened an account with defendant in the name of "A. J. Martin, Special." Martin testified that at the time of opening this account, or at least in January, 1918, he explained its purpose to defendant's cashier. Under the method of business adopted, all moneys sent by plaintiff to meet the bills and pay rolls of the Rabbitt Company were deposited by Martin to the credit of that account. When a pay roll became due, Martin drew his check for its exact amount, deposited it to the credit of the Rabbitt Company, and got the money on its check to the order of "Cash." By agreement of January 21, 1918, plaintiff took over the work which the Rabbitts had contracted to do and proceeded itself to complete the Charleston plant. Under this agreement plaintiff assumed sundry unpaid labor and material bills of the Rabbitt Company, and the latter turned over to plaintiff all its tools, appliances, and materials on or in transit to the work, together with its entire organization, and James E. Rabbitt was employed as superintendent at a fixed salary. The Rabbitt Company was released from all financial responsibility in respect of the work as from the date of the new agreement. Other details of the arrangement may be omitted. After it was made, the prior method of providing for the pay rolls was continued; that is to say, Martin would draw a check on the "Special" account for the necessary sum, deposit the same to the Rabbitt Company's credit, and then draw the money on the latter's check to the order of "Cash"; and so the matter went on until the 9th of March.

Meanwhile defendant, finding itself unable to collect the $15,000 which it had loaned to the Rabbitts, and claiming that plaintiff was liable for the same, was having the correspondence to which we have referred. A plan was apparently formed to secure at least part payment of the Rabbitt note, or, as the cashier says, "to find out who was going to pay, whether M. Rabbitt & Sons Company or the Owens Bottle-Machine Company." Accordingly he began to watch the account of the Rabbitt Company, and instructed the tellers to let him know when they made a deposit. On March 9th two pay rolls of plaintiff became due—one a general labor pay roll for $6,450.80, and the other a bricklayers' pay roll for $242.05. Following the usual custom, one Clay, an employé of plaintiff, who had been in the employ of the Rabbitt Company and in the habit of handling the pay rolls, both before and after the January agreement, telephoned the bank to make up the "change list" for the "Owens Company." He advised the bank over the telephone, "how many twenties, how many tens, how many fives, how many ones, how many quarters, nickles, and dimes, I wanted," and that he would be down later to get the money. He then procured two checks, drawn by Martin on the "Special" account, one for $6,450.80 for the general labor pay roll, and another for $242.05 for the bricklayers' pay roll. These checks were drawn to the order of the Rabbitt Company and indorsed for that firm by M. J. Rabbitt. At the same time Clay procured two checks for the same amounts drawn by the Rabbitt Company to the order of "Cash." These checks respectively bore certain notations which showed that they were drawn to meet pay rolls.

When Clay called up the bank in the morning, he gave the amount and "change list" of the general pay roll only. Later he went to the bank, taking the four checks with him, and handed them to Green, one of the tellers. Green took the deposit and gave Clay a duplicate receipt. Clay says that at that time he saw the money for the general labor pay roll lying on the desk, done up in a canvas bag, and that he knew it was his pay roll because it was marked by a small tag tied to the bag on which was written "Owens Pay Roll." As he had not given the bank the change list for the smaller pay roll over the telephone, he gave it to Green personally at the teller's window. Green made up this pay roll, placing the necessary coin and currency in a canvas bag which he left near the window. Clay then handed him the Rabbitt Company's checks, which Green thereupon pushed through the window to the adjoining office, telling Clay that he had given them to Mr. Lewis, the cashier, and that Clay would have to see Mr. Lewis. The upshot was that the bank refused to pay the Rabbitt Company's checks and instead credited the same on the $15,000 note. Lewis admitted that he knew a deposit of $6,692.85 had just been made, that he was told so by Green, and also knew that the Rabbitt checks presented for payment at the same time were for the same aggregate amount. It appears to us not doubtful, and a jury would certainly be warranted in finding, that Green and Lewis both knew that the Owens Company's checks were deposited solely to provide

funds to meet the Rabbitt Company's checks, and that the latter were drawn solely to provide cash for the two pay rolls.

We deem it unnecessary to discuss these facts at any length. The mere statement of them seems to be sufficient to show that the learned trial judge was in error in holding as matter of law that the deposit thus made was not a special deposit. We are not prepared to say, nor is it needful now to decide, that a verdict should have been directed for the plaintiff on this issue; but we do hold that it was at least a question for the jury under proper instructions. The only proof of knowledge on the part of the bank essential to plaintiff's case was proof that the bank, when it accepted the deposit, knew of the purpose for which it was made, and that the bank had such knowledge appears practically undisputed. Even if it be assumed, as defendant contends, that it did not know that Clay represented the plaintiff, but supposed him to be an agent of the Rabbitt Company, that fact would not suffice to defeat the plaintiff's right to recover. On that assumption Clay was the agent of an undisclosed principal, and it has long been settled that an undisclosed principal may sue on agreements made by and with his agent, although the fact of such agency was unknown to the other contracting party. Baldwin v. Bank, 1 Wall. 234, 17 L. Ed. 534; Ford v. Williams, 21 How. 287, 16 L. Ed. 36. Without reviewing the testimony in greater detail, or indulging in further comment, we repeat our conviction that plaintiff was clearly entitled to have the question submitted to the jury.

It follows that the judgment must be reversed, and the cause remanded, with instructions to grant a new trial.

Reversed.