**STANDARD ACC. INS. CO. v. SIMPSON et al.**

**CONSOLIDATED INDEMNITY & INS. CO. et al. v. DEAL BROS. MILLING CO. Inc., et al.**

**Nos. 3396, 3397.**

Circuit Court of Appeals, Fourth Circuit.
April 4, 1933.

Douglas McKay, of Columbia, S. C. (McKay & Manning, of Columbia, S. C., on the brief), for Standard Acc. Ins. Co.

E. W. Mullins, of Columbia, S. C. (Nelson & Mullins, of Columbia, S. C., on the brief), for Carolina Contracting Co.

Irvine F. Belser and James B. Murphy, both of Columbia, S. C. (J. C. Oxner, R. Beverley Sloan, and Pickney L. Cain, all of Columbia, S. C., on the brief), for materialmen and laborers.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

These are appeals from a decree in two cases which were consolidated and heard together below and which involve questions of liability under bonds of a road contractor and a subcontractor. The contractor was the Carolina Contracting Company, which had entered into a number of contracts covering the construction and paving of roads and streets for the county of Richland and the city of Columbia. The surety on its bonds covering the projects here involved was the Consolidated Indemnity & Insurance Company, hereafter referred to as the Consolidated. The subcontractor, who entered into contracts with the contractor for the grading and drainage work on the various projects, was one F. W. Simpson; and the surety on the bond which he executed to the contractor was the Standard Accident Insurance Company, hereafter referred to as the Standard. The controversy arises out of claims, aggregating $55,443.28, for materials furnished to the subcontractor, who is now insolvent, for use on the various projects.

The court below held that the bond of $25,000, originally executed by the Standard to guarantee the performance of the first contract awarded to the subcontractor, had been extended to cover subsequent contracts and that the total of its coverage after the extensions was $51,601.40, or 50 per cent. of the amount called for by the contracts. Decree was entered against the Standard for this amount, plus interest in the sum of $916.90 and attorneys' fees of $800 allowed counsel for the contractor. The court held, further, that the contractor and its bondsman, the Consolidated, were liable for the claims of the materialmen, since the materials in question were used on projects covered by its contracts and the bonds guaranteeing them. Fees of counsel for claimants to the amount of $1,000 were allowed out of a fund in the hands of the contractor representing retained percentage on contracts of the subcontractor. From this decree one appeal is prosecuted by the Standard and another by the contractor and its bondsmen, the Consolidated. On the appeal of the Standard, the question presented is the extent of its liability, as it admits liability for $25,000 and has paid this amount into court. On the appeal of the Consolidated and the contractor, the question is their liability for materials and supplies furnished the subcontractor and for the fees allowed attorneys of claimants.

The facts necessary to an understanding of the appeal of the Standard are as follows: About February 20, 1930, the county of Richland awarded to the contractor a contract for the construction of three sections of improved highway, embracing five miles on the Old Winnsboro Road, three miles on the Asylum Road, and two miles on the Leesburg Road. At the same time, the contractor entered into a contract with the subcontractor to do the grading and drainage work on these projects at certain unit prices, which it was estimated would amount to $48,855. The contract between the contractor and the subcontractor provided that the latter should give bond for the faithful performance of his contract in the sum of $25,000; and bond in this amount was duly executed with the Standard as surety. Premium on this bond was calculated at $15 per $1,000 of the contract price; and a premium of $732.80 was paid at the time of its execution. The application for this bond contained a provision that, upon the completion of the work under the contract, the premium would be adjusted in accordance with the certificate of the engineer in charge of the work. Although it is said that the contract between the contractor and the subcontractor contained a provision as to the extension of same, we find nothing of this sort in the contract, except a provision in the clause as to time, which provides that: "If the satisfactory execution in completion of the contract shall require work or material in greater or lesser amounts or quantities than those set forth in the contract, then the contract time shall be increased or decreased in the same proportion as the altered amount of work bears to the original work contracted for." There is nothing in either the contract or the bond to indicate that in executing the latter it was contemplated that any projects would be guaranteed by it other than those embraced in the contract. The bond is captioned as "Assuring execution of contract for construction of approximately five miles, old Winnsboro Road, three miles Asylum Road, and two miles Leesburg Road in Richland County."

Some time after this, the contractor was awarded three separate contracts covering road projects by the county of Richland and two covering street work by the city of Columbia. For each of these contracts a separate bond was executed by the contractor just as in the case of the first contract. The contractor sublet to the subcontractor the grading and drainage work under all of these contracts, but no additional written contracts were signed between them; it being understood in each case that the subcontractor should take the work under the terms set forth in the original contract. No additional bonds were executed by the subcontractor covering the additional work awarded him; but it appears that the local agent of the Standard, one T. P. McCrae, told him and one of the officers of the contractor that the original bond would be extended to cover the liability of the subcontractor on these additional contracts to an amount equal to 50 per cent. of the amount to be paid under the contracts. No written application for bond was made as the basis of any extension of liability, no premium was paid therefor, and no assumption of liability or change in the coverage of the original bond was reported to the Standard by McCrae. No writing was signed by McCrae evidencing any change in liability except with respect to the second extension of the work on the Old Winnsboro Road, as to which there was a change in the unit prices allowed for the work. To cover this, a "rider" was executed by McCrae in the form of a letter addressed to the contractor under date of August 20, 1930, as follows:

"Aug. 20th, 1930.

"Carolina Contracting Company,
"Columbia, South Carolina.

"Gentlemen: Re: SA–50751–420—Frank W. Simpson.

"The Standard Accident Insurance Company as surety on the above captioned bond hereby consents to the extension of the contract covered by this bond to cover the structures and grading on the Winnsboro road from survey station 284 towards the Fairfield county line as described in letter of award from the Carolina Contracting Company to Frank W. Simpson under date of July 3rd., a copy of which is attached to this letter.

"In consenting to this extension, it is mutually agreed and understood that this in no way changes the company's liability under the bond as originally written, but extends the liability of this bond to an amount equal to 50% of the amount the contract is extended.

"Standard Accident Insurance Company
"By T. P. McCrae, Attorney-in-fact.
"TPM/R encl. [Seal.]"

With respect to the authority of McCrae to bind the Standard by the verbal extensions of liability and the provisions of this rider or letter, it appears that he held merely an or-

dinary power of attorney from the Standard authorizing him to execute bonds in an amount not exceeding $100,000, when attested and the seal of the company attached thereto by either Douglas McKay or J. A. Manning. His letter of instructions contained the following provision: "Do not consent to any alterations or extensions as to any previously executed obligation nor give any assent to *any extension of time* nor any alteration of any contract for which this company is surety. You have no authority to make any kind of verbal or written agreement *after a bond* has been executed. This authority rests only with the home office. By disregarding these instructions you may release our reinsurers, our indemnitors, or the *bond itself* may be void and your action may *revive liability* causing loss to the company."

There was evidence that the Standard had permitted McCrae to execute bonds for it without requiring the countersignature of McKay or Manning, although the evidence on the part of the company was that this was allowed only where the execution of the bond was authorized directly by the home office. McCrae testified that he had extended other bonds in substantially the same manner as the bond involved in this case and that no objection was made by the Standard. The assistant secretary of the Standard and its division manager denied, however, that any such extensions were authorized or approved by the company. McCrae admitted that no notice of such extensions was furnished to the home office and no information given it as to extensions until the contracts were completed, when the information was given in the "Termination Evidence Report," which is presumably the report made when the premium was adjusted at the completion of the contract. There was no evidence of any specific instance where the company had ever approved an extension of liability on a bond by McCrae, and no evidence that the contractor ever had knowledge of any such extension or any other fact which would justify a belief that McCrae possessed any such authority.

██ We think there can be no doubt but that the verbal extensions of liability under the bond were void under the South Carolina statute of frauds, as a special promise to answer for the "default, or miscarriage of another person." Code of Laws of 1932, vol. 3, § 7044. When the contracts were awarded to the subcontractor, he became, of course, the person primarily liable for their performance; and, when McCrae agreed that the bond previously given by him should be extended to cover these contracts, it was a clear case of a collateral promise to answer for his default or miscarriage. It is not necessary to distinguish between guaranty or suretyship or to inquire which relationship would have been established by the promise if valid; for in either case a writing was required to give it validity. 21 R. C. L. 962; 12 R. C. L. 1072; Mead v. White, 53 Wash. 638, 102 P. 753, 23 L. R. A. (N. S.) 1197, 132 Am. St. Rep. 1092.

And we are not impressed with the argument that, because parol contracts of insurance are generally recognized as valid, parol contracts of guaranty or suretyship should be so recognized because of the cases which hold that such contracts on the part of compensated sureties are in effect contracts of insurance and not governed by the strictissimi juris rule of the common law. In these cases, of which Maryland Casualty Co. v. Fowler (C. C. A. 4th) 31 F.(2d) 881, 63 A. L. R. 1375, is typical, the courts were construing the meaning and effect of the language used in bonds of surety companies; and the effect of the decisions is merely that these bonds are to be interpreted and enforced under the rules governing policies of insurance. It was never intended to say that what is in fact a contract of guaranty or suretyship should be held in law to be a contract of indemnity, or that the contract of a surety or a guarantor, which the law requires to be in writing, should be held valid even though in parol, merely because the guarantor or surety was compensated.

██ But we think that these verbal extensions of liability were void for the additional reason that they were not authorized by the Standard, and that the extension evidenced by the letter or rider of August 20th was void for the same reason. We have carefully considered the findings of the referee approved by the judge below with respect to this matter; but we think that undue weight has been given to the fact that McCrae had signed bonds for the company without the countersignature of the persons required in his power of attorney. The question is not as to the authority of McCrae to sign bonds without such countersignature, but as to his authority to modify bonds already issued so as to enlarge the liability which the company had undertaken thereunder. The two things are entirely different; and a clear case is presented for the application of the rule that no

power to vary an agreement is to be inferred from a general power to make it. 2 C. J. 645; Maybank & Co. v. Rodgers, 98 S. C. 279, 82 S. E. 422. When a bond is executed, premiums ordinarily are collected, indemnity agreements are secured, copies are sent to the company, and a basis is furnished for the proper gauging of the company's liability and the reinsurance of risks. The exercise of such power, moreover, interferes in no way with business already transacted or with reinsurance which has been effected. The exercise by the agent of the power to extend liability on existing bonds, however, would introduce veritable chaos into the business of the company. With widely scattered agents exercising such power, it would be a matter of extreme difficulty for the company to estimate and maintain its legal reserves against outstanding risks, contracts of reinsurance would be affected, and it would be almost an impossibility for the company to estimate its outstanding liabilities, especially if the agents followed what McCrae says was his custom of not reporting extensions or collecting premiums until the contracts guaranteed had been completed. It was no doubt upon such considerations that the standard in its instructions to agents warned them that they had "no authority to make any kind of verbal or written agreement after a bond has been executed."

The fact that the company held McCrae out as its agent throws little light upon the question which must be decided. It is true, of course, that one placed in a position of apparent authority is clothed with the incidental powers of such position and secret limitations upon his authority are not binding upon third persons having no notice thereof; but the power to enlarge the liability under bonds already executed by a company is not one of the ordinary or incidental powers of its agents; and, before the company can be held bound by such attempted exercise of power, it must be shown either that the agent actually had such authority or that the conduct of the company had been such that it is estopped to deny that he possessed it.

On the record before us, we do not think the conclusion justified that McCrae had actual authority to change or extend the liability under bonds which the company had previously executed. As pointed out above, his letter of instructions expressly forbade such action on his part; and while it is true that he testified generally that on other occasions he had extended other bonds and that the company had made no objection, the assistant secretary of the company and its regional manager denied that it had information of any such practice. In the face of this denial, something more than general statements was required to justify the conclusion that the company had clothed McCrae with a power so extraordinary and unusual and one so manifestly fraught with the gravest danger to the company's interests. It is scarcely believable that a bonding company would clothe an agent with such authority; and, to establish it, clear and convincing evidence of the circumstances should have been adduced. See Owens Bottle-Mach. Co. v. Kanawha Banking & Trust Co. (C. C. A. 4th) 259 F. 838, where this rule is laid down with regard to another unusual and dangerous power of an agent, that of borrowing money on the credit of the principal. We are advertent to the rule that great weight must be given to the findings of the master when approved by the trial judge; but in an appeal in equity we review the facts as well as the law, and the review is a real review and not a perfunctory approval. After carefully weighing and considering the evidence in the light of the rule, we do not feel that it is sufficient to justify the conclusion that the company either expressly or by implication vested McCrae with authority to enlarge its liability under bonds previously executed.

And we see no evidence whatever upon which agency by estoppel may be predicated. To raise such estoppel it must appear that the party asserting it has acted upon an appearance of authority with which the principal has clothed the agent. As said in 21 R. C. L. 856: "A party dealing with an agent must prove that the facts giving color to the agency were known to him when he dealt with the agent. If he has no knowledge of such facts, he does not act in reliance upon them, and is in no position to claim anything on account of them." There is nothing in the evidence to show that, when McCrae made the agreement to extend the coverage of the bond, the contractor knew any facts which justified the assumption that he possessed any such authority. The fact that McCrae assumed to exercise the authority was, of course, no ground of reliance. 2 C. J. 563; Metropolitan Casualty Ins. Co. v. Potomac Builders' Supply Co., 61 App. D. C. 255, 61 F.(2d) 407. If it were, the agent, and not the principal, would control the limits of authority. As was well said by the late Judge Woods, speaking for this court in Richmond

Guano Co. v. E. I. Du Pont de Nemours & Co., 284 F. 803, 806: "It is elementary that those who deal with agents must ascertain at their peril the scope of the agency. Dows v. National Exchange Bank, 91 U. S. 618, 636, 637, 23 L. Ed. 214; Thatcher v. Kaucher, 131 U. S. Appendix cxlvii, 24 L. Ed. 511; Owens Bottle-Machine Co. v. Kanawha Banking Co. (4th Circuit) 259 F. 838, 170 C. C. A. 638; Raven Red Ash Coal Co. v. Herron, 114 Va. 103, 75 S. E. 752; 2 Corpus Juris 562, 563, 564, 569, 594. 'The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and, like a railroad crossing, suggests the duty to "stop, look and listen," and he who would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority, and in case either is controverted the burden of proof is upon him to establish it. In fine, he must exercise due care and caution in the premises.' Brutinel v. Nygren, 17 Ariz. 491, 154 P. 1042, L. R. A. 1918F, 713, 717."

■■■ Our conclusion, therefore, is that the Standard is liable only under the bond as originally executed. With respect to interest, we think that, as it was clear from the beginning that the company was liable on the claims against the subcontractor for the full penalty of the bond, it should pay interest at the legal rate from the time of the institution of the action until the payment of the $25,000 into court, which occurred something over a year later. See New Amsterdam Casualty Co. v. U. S. Shipping Board (C. C. A. 4th) 16 F.(2d) 847, 852, and cases there cited. We do not think, however, that the Standard should be charged with any of the fees of counsel for the contractor or claimants, and with only such part of the costs in the court below, including the fee allowed the special master, as would have been a proper charge against it if there had been no controversy over the amount of its liability.

Questions Presented by Appeal of Contractor and its Surety.

■■■ The principal question presented by the appeal of the contractor and its surety is the question as to their liability for materials and supplies furnished the subcontractor. As the subcontractor is insolvent and his bond is liable only for the penalty of $25,000 and interest, the question involves a balance on the claims amounting to approximately $30,000. We think that the learned judge below was correct in holding both the contractor and its

surety liable for these claims. Each of the bonds, signed by the contractor as well as the surety, guaranteed that the contractor would "pay when and as due all lawful claims for labor performed or materials and supplies furnished for use in and about the construction of said highway or highway structures"; and we do not see how the letting of a part of the work to a subcontractor could be held to absolve the contractor or the surety from the obligation so undertaken. The public authorities were interested in providing that those who furnished labor or materials for the construction of the highways should be paid for them; the bonds were taken for the purpose of guaranteeing that this would be done; the contractor could not have obtained the contracts without giving such bonds; and we do not think that, after they have been given and the contracts thereby obtained, laborers and materialmen, for whose protection they were required, should go unpaid because the work has been let to a subcontractor, who has given an inadequate bond and who proves to be insolvent. This has been expressly decided by the Supreme Court of the United States in suits instituted under the Hurd Act (40 USCA § 270). United States for Use of Hill v. American Surety Co., 200 U. S. 197, 26 S. Ct. 168, 50 L. Ed. 437; Mankin v. U. S. to Use of Ludowici-Celadon Co., 215 U. S. 533, 30 S. Ct. 174, 54 L. Ed. 315. And the same rule is supported by the overwhelming weight of authority in other jurisdictions. See exhaustive note in 70 A. L. R. 308 and cases there cited.

■■■ It is said, however, that the contractor and surety are relieved of this liability by reason of a section of the specifications which provides: "8. 1. Subletting or assigning of contract. The work awarded shall be performed by the contractor to whom the award is made, with the assistance of workmen under his immediate superintendence; and the contract shall not be sublet, assigned or otherwise disposed of, either in whole or in part, except with the written consent of the Richland County Supervisor. Before any such consent is requested, the contractor shall submit evidence that the party to whom it is proposed to make assignment is competent and responsible together with a statement from the surety company concerned showing that the contract bond is authorized to cover all operations and obligations of the proposed assignee. Any subcontractor, regardless of whether he has been approved by the Board of County Commissioners, will be considered

an agent of the principal contractor, provided that this shall not serve to make the principal contractor liable for purchase made by the subcontractor from third parties without the specific approval of the principal contractor."

It is true, of course, that the contract and bond are to be construed together. Maryland Casualty Co. v. Fowler (C. C. A. 4th) 31 F.(2d) 881, 63 A. L. R. 1375; Standard Oil Co. v. Powell Paving & Contracting Co., 139 S. C. 411, 138 S. E. 184. But we do not think that this provision of the contract relieves either the contractor or the surety of their undertaking that labor and materials furnished for the work shall be paid for. Its manifest purpose was to prevent subletting without the approval of the public authorities, and to hold the contractor for the acts of any subcontractor by making the latter his agent. The purpose of the proviso in the last sentence was merely to limit this agency, not to absolve the contractor or his surety from liability for labor and materials that should be used in performing the contract. The fact that the contractor was not to be liable as principal for purchases made by the subcontractor, could not have been intended to affect the liability under the bond, and should not be given an interpretation at variance with the other provisions of the instruments and the manifest purpose for which the bond was required.

■ The point is raised by the contractor and his surety that attorneys' fees should not have been allowed against them in favor of the attorneys of claimants. We agree with the court below, however, that such allowance was proper. The bonds contain a provision relating thereto as follows: "And should the said principal default in carrying out said contract, the cost to the Board of Commissioners of Richland County of determining the amount of the losses caused the said Board of Commissioners of Richland County by reason of said default, as well as all cost incident to securing settlement from the surety, including reasonable attorney's fees, shall be payable and collectible from the surety, as a part of the penalty of the bond."

This provision clearly contemplates that those entitled under the bond shall not be put to expense in enforcing its provisions. If suit had been brought by the obligee named to enforce the bond for the benefit of laborers and materialmen, there could be no question as to the liability for the fees of counsel in the proceeding; and we cannot see how the fact that it was brought by the material-

men themselves, instead of by the obligee named, makes any difference as to this liability. It is well settled that laborers and materialmen protected by a bond such as this may institute proceedings for the enforcement of their rights. Maryland Casualty Co. v. Fowler, supra; Standard Oil Co. v. Powell Paving & Contracting Co., supra. And, where they do institute the proceeding and thereby incur expense, there is no reason to deny them the benefit of this provision.

■ It is argued that under the ejusdem generis rule the right to recover the cost incident to securing settlement, including attorneys' fees, is limited to the named obligee, because only the named obligee can recover the cost of determining the losses caused to it by reason of the default of the contractor in carrying out the contract. But only the named obligee would be put to cost in determining the loss in that event, whereas laborers and materialmen as well as the named obligee might incur cost in securing settlement from the surety, and there is thus no basis for applying the ejusdem generis rule, which rests upon the presumed intention to restrict general expressions following an enumeration of particulars to things of the general class of those enumerated where no contrary intention appears. 6 R. C. L. 843. If it had been intended that only the named obligee should recover such cost, the intention should have been expressed plainly instead of by the general provision that same should be collectible as a part of the penalty of the bond. As has been frequently said, these bonds are like policies of insurance, and where doubt exists as to their meaning, their language is to be liberally construed in favor of the parties whom they are designed to protect. Maryland Casualty Co. v. Fowler, supra; Maryland Casualty Co. v. Ohio River Gravel Co. (C. C. A. 4th) 20 F.(2d) 514; Pickens County v. Nat. Surety Co. (C. C. A. 4th) 13 F.(2d) 758; Atlantic Trust & Deposit Co. v. Town of Laurinburg (C. C. A. 4th) 163 F. 690.

It follows that on the appeal of the Standard, the decree of the court below will be reversed. On the appeal of the Consolidated and the contractor, it will be affirmed. On both appeals the cause will be remanded for further proceedings not inconsistent with this opinion, and with power in the court below to reconsider allowances,[1] retax costs, and

[1] See opinion of this court in Ætna Casualty & Surety Co. v. American Surety Co. et al., 64 F.(2d) 577, this day decided.

make further orders as to distribution of funds in its hands.

No. 3396 reversed and remanded.

No. 3397 affirmed and remanded.