## Moore's Executors versus Patterson.

| 28 | 505 |
| 24 SC [3] | 68 |
| 28 | 505 |
| 29 SC [3]630 |  |
| 28 | 505 |
| f221 | [1]537 |
| 28 | 505 |
| 38SC [2] | 91 |

A party, in order to avail himself of the acts and declarations of an agent to affect the principal, must prove the agency, and the extent of it.

Acts done by the alleged agent, are not proof of his authority to act for the principal.

It is error to submit to the jury the question of whether the party subsequently ratified the act of a person acting without authority, where there is no evidence that the facts were ever communicated to the party, or that he assented to the acts alleged to be done for him.

The payment of freight to a common carrier for the freight delivered, was no evidence of a release to him by the owner, for goods received by the carrier, but never delivered.

In such case the owner had his option either to sue for the goods as an independent demand, or to set off their value against the claim for freight on the balance of the goods.

ERROR to the Common Pleas of Blair county.

This was an action of assumpsit, brought by Robert Moore, in 1842, against Henry L. Patterson. The plaintiff resided in Huntingdon and the defendant in Hollidaysburg, and had a wharf and warehouse there, and was a common carrier on the Pennsylvania Canal. In the fall of 1841, Stewart & Horrell, warehousemen at Water Street, shipped on canal boats belonging to the defendant 1577 blooms for the plaintiff, Robert Moore, to be delivered in Pittsburgh. Of these blooms, 430 were not delivered to the plaintiff's consignee at Pittsburgh; and this action was brought to recover the value of them. The plaintiff died pending the action, and his executors were substituted.

On the trial in the court below, the plaintiffs proved the shipment of the blooms, to the number of 1577, on the defendant's boats, and produced the manifests signed by the masters of the boats. They also proved that but 1147 of these blooms were delivered for Moore to the consignee at Pittsburgh.

These blooms were made at "Elizabeth Forge," on Spruce Creek, by Hileman & Hammond, by whom they were sold to Moore, and delivered to Stewart & Horrell at Water Street for him.

The defendant resisted a recovery, and showed that after the blooms arrived at his warehouse in Hollidaysburg, Mr. Hammond, of the firm of Hileman & Hammond, came there and stated that there was a mistake in the shipment of those 430 blooms for Moore, and wished to have them shipped to Pittsburgh on account of Hileman & Hammond, and which was acordingly done. That the matter was afterwards arranged by Moore settling with Patterson and paying him the balance of the freight on the 1147 blooms. And that Moore, through his son Joseph Moore, agreed to take from Hileman & Hammond other blooms in place of the 430, and released Patterson from any liability.

The defendant gave in evidence the following paper produced on notice by the plaintiffs :—

"Mr. Robert Moore, 1841,
      Pittsburgh, February 10th, 1842.
         To Mechanics' Line Dr.
For freight on 1147 pieces blooms from Hileman & Hammond, weighing 109,865 lbs @ $7.25 ⅌ 2000   .  .  $398.26
           Received on the within $75  .  .    75.00

                                         323.26
           Received on the within $250 .  .   250.00

                                          73.26
Received, June 14th, 1842, of Robert Moore, seventy-three dollars and twenty-six cents in full.
                              H. L. Patterson."

They then called John T. Horrell, who deposed :—"At one time Joseph Moore, a son of Robert Moore, came to the warehouse to see what blooms were sent to Pittsburgh for his father, is the only knowledge I have of his doing business for his father. I gave him a statement, and he went to Hollidaysburg with it, and returned. I had lived a few years with Mr. Moore. Joseph did not attend to his father's business then—I did. I did not know any other person he had to attend to business for him, when he got the account of blooms given Joseph. Mr. Moore was not in the iron business at the time."

Cross-examined: "Could not say what age Joseph was at the time. He must have been seventeen years of age, but I do not recollect anything about his age. When he returned to Water Street he gave me a good deal of insulting language, with regard

to a statement Mr. Nelson had given him—that we had made one shipment wrong, as Mr. Nelson told him that we had not shipped them for his father, but had shipped them for Hileman & Hammond."

Re-examined by plaintiff: "The only evidence I have of his agency was his coming back and censuring us for the error. I have seen Joseph in his father's store in Huntingdon."

Lewis Mytinger sworn: "I was acquainted with Joseph Moore. Suppose he is now approaching twenty-eight or twenty-nine. Have no certainty of his age. Do not know of his attending to business for his father. The old man kept store in Huntingdon—do not know of his keeping store for his father."

They then offered the deposition of William Nelson, to which the plaintiffs objected on the ground of incompetency of witness; he being liable to Patterson, in case of a recovery, for his negligence. The court overruled the objection, and the deposition was read as follows:—

"I was clerk for Henry L. Patterson, the defendant in this case, in his warehouse, in Hollidaysburg, in 1841. Henry L. Patterson carried some blooms from Water Street for Robert Moore. They were in several lots. They were manufactured by Hileman & Hammond, at the forge on Spruce Creek. After carrying some few lots, manifested Hileman & Hammond for R. Moore. These manifests were made by Stewart & Horrell, at Water Street. There was one certain lot of something, over 400 pieces, came to Hollidaysburg, to Mr. Patterson's warehouse, manifested as above stated. After they were put out of the boat, Mr. Hammond, of the firm of Hileman & Hammond, came to see about those blooms, and stated that there was a mistake in the shipment of that lot. That they were not intended for R. Moore at all; but they had a lot at Water Street for R. Moore; and those that had come there, should be sent to Pittsburgh, as their own; that is, Hileman & Hammond, and Mr. Moore should take this lot at Water Street; and that lot of blooms was sent to Pittsburgh, for Hileman & Hammond, according to Mr. Hammond's direction.

"After some time R. Moore's son, who was attending to his business, called at the warehouse of H. L. Patterson, to see about their bloom account, having a statement with him from Water Street. We went to compare them, to see how the number of pieces agreed. When we came to this lot of 400 and some pieces, I then explained to him how it came. He likewise got a statement of the matter. This Mr. Hammond happened to be in town the same day; Mr. Hammond and Mr. Moore got together, and came into the office. They then got to talking about this lot of blooms. Mr. Hammond told him the same thing he had told me, as I have stated before. He told Mr. Moore that that lot of blooms, laying on the lower end of the wharf at Water Street, was his father's

[Moore's Executors *v.* Patterson.]

(R. Moore's) blooms, and he mentioned the number of tons; but I do not recollect; it was either 10 or 20, a considerable larger lot than this that went to Pittsburgh, which Mr. Hammond said would be the amount of blooms due them at that time. Mr. Moore replied, Very well; we will take these blooms, and send them to the east, instead of the west. Mr. Moore said he was satisfied, as there was more in this lot than that went to Pittsburgh. They parted with this understanding, that this lot of blooms, which was at Water Street, should be taken in place of that sent to Pittsburgh. I forgot to lift the statement I gave Mr. Moore, previous to this arrangement. I had a full understanding from them, that this was satisfactory to the parties. In my first conversation with Mr. Moore, I thought there might be some difficulty; but after the parties (Hammond and Moore) had met and talked the matter over, I was satisfied that all was over. I was satisfied that all was perfectly arranged."

*G. Taylor*, attorney for plaintiff, reserving all legal exceptions to the competency of the witness, and to the matter and relevancy of the foregoing deposition, cross-examined the witness, as follows:—

Cross-examined: "I mean that manifests, or bills of lading, were brought with them, when I say they were manifested. Those bills of lading were generally filed in the office in the warehouse—those that came from Water Street. I do not know where they are now. New manifests were made at Hollidaysburg, and sent to Johnstown with the blooms. These 400 blooms were manifested for Hileman & Hammond. Henry Carner was on one of H. L. Patterson's boats. He had not the command of the boat. These blooms were carried either on the Red River, Boxer, Industry, or Spy. I am not certain what was the name of Mr. Moore's son, but think it was Joseph. I never had any conversation with Mr. Moore himself, about the blooms. It was the son all the time. I think it was in the spring of 1842, Mr. Moore's son called to see about the blooms, when he alleged the 400 blooms were there, according to the statement he had from Water Street. I gave the young man, at that time, a statement of the blooms carried by Mr. Patterson, for Mr. Moore. This is the statement, (hereto attached, marked A.) It was me that manifested the blooms for Hileman & Hammond, at Hollidaysburg, by Stephen Hammond's direction. I made all the manifests. There was no other clerk at that time.

"Statement 'A.'

"*Blooms received and shipped for R. Moore.*

| | | |
|---|---|---|
| Sept. 30, 1841, | . . . . . . | 50 |
| Oct. 20, 1841, | . . . . . . | 801 |
| March 22, 1841, | . . . . . | 296 1147 pieces. |

[Moore's Executors *v.* Patterson.]

" There was 430 pieces received on the 30th October, marked Hileman & Hammond, which Mr. Moore says was for him, but went on in the name of Hileman & Hammond, and settled as such in Pittsburgh.

H. L. PATTERSON,

" Hollidaysburg, March 7, 1842.          Per W. NELSON."

Plaintiffs then called John T. Horrell: " Joseph Moore did not claim any iron at Water Street for his father when he came back, as left there for him by Hileman & Hammond, in place of the 430. Had no orders from Hileman & Hammond to ship any blooms for Mr. Moore lying at the lower end of our wharf, at any time. Shipped in December, 1841, 613 pieces to Henry L. Patterson for Hileman & Hammond. We had no blooms of theirs in the spring of 1842, but 59 pieces and a lot weighed off of theirs before for the Messrs. Bell."

Cross-examined: " May have been a shipment of blooms in the names of Hileman & Hammond made. Did ship 510 pieces 10th June, 1842, to McBride & Royer. Blooms lay there some time occasionally after they came there. The McBride & Royer blooms must have been ordered for them, or we would not have shipped them. Never had any orders from Hileman & Hammond after March, 1842, to give blooms to Moore."

The plaintiff presented the following points:—

1. That the 430 pieces of blooms in controversy, having been received and receipted for by the defendant or his agent, as a common carrier, to be carried from Water Street to Pittsburgh for Robert Moore, the admitted non-delivery of them at the latter place rendered the defendant liable for their value, and that the plaintiffs must recover.

2. That there is not evidence, such as is sufficient to show Joseph Moore to have been an agent of Robert Moore, legally authorized to release a debt or liability of the defendant to Robert Moore; and that nothing said or done by him is to be regarded or treated as such release.

3. That the deposition of Nelson, if true, and if Joseph Moore were shown to have been a duly authorized agent, does not in law prove a release; and that the verdict of the jury should be for the plaintiffs.

4. That if the jury believe that Joseph Moore had authority from Robert Moore, and actually made the arrangement in relation to the 430 pieces of blooms as testified by Nelson, still Henry L. Patterson would not be thereby released from his liability if the jury believe that Hileman & Hammond had not, or did not give blooms at Water Street to Moore in lieu of the 430 pieces in controversy.

[Moore's Executors *v.* Patterson.]

The court below (WILSON, P. J., holding a special court) answered these points as follows :—

1. " We say, as requested, that the 430 pieces of blooms in controversy, having been received and receipted for by the defendant or his agent, as a common carrier, and to be carried from Water Street to Pittsburgh for Robert Moore, the admitted non-delivery of them at the latter place rendered the defendant liable for their value ; but we do not say that therefore the plaintiff is entitled to recover. The facts here stated rendered him liable, and unless released from that liability by Robert Moore, the plaintiffs will be entitled to your verdict.

2. " To this general position we assent : There is not evidence to show that there was any such authority in Joseph Moore to authorize a release ; nor is there anything said or done by him to be treated or regarded as such release that would be binding on Robert Moore, unless the evidence satisfies you that Robert Moore afterwards ratified what Joseph did ; and that he agreed to take the blooms at Water Street, as represented by Nelson in his deposition, and to release Patterson from his liability. Patterson was clearly liable for the 430 blooms when Joseph went to him. There is not evidence to show that he went with authority to release the liability. Does the evidence show that he afterwards ratified an act of his son releasing him ? is a question for you.

3. " This will depend on how you find the bearing and import of his testimony to be as to what was agreed upon in relation to his releasing Patterson.

" What it proves on this subject is for you to determine ; and what you determine was agreed on by the parties, you will apply to the general principles we have referred to in our charge. We refuse to answer as requested the point as stated."

4. "If you find that Joseph Moore had authority as here stated, and agreed in making the arrangement to take Hileman & Hammond for the blooms, and release Patterson, the law would not be as here stated. But if you find that the arrangement was made as stated by the witness, and Joseph Moore with authority from his father, but that it was made on condition that Hileman & Hammond had the blooms at Water Street for his father, or would furnish them there, but neither had, nor furnished them there for his father, Henry L. Patterson would still be bound."

In the general charge to the jury were contained the following instructions :—

" If Joseph Moore was authorized by his father to settle this matter with Mr. Patterson, and agreed to take upon the strength of Mr. Hammond's representation, and release Patterson, *or* if Robert Moore afterwards sanctioned and agreed to this arrangement made by his son, it *would be binding,* and *he could not*

*recover.*    If Hileman & Hammond had no blooms there, it would be a matter for you to consider in determining (if Joseph had not authority to make such arrangement) whether his father afterwards sanctioned what Joseph had done; whether he would sanction it if there were no blooms there left by Messrs. Hileman & Hammond for Mr. Moore, or any blooms there to fill Mr. Moore's demand for his blooms, which Nelson had missent.

"Again, if Joseph was the agent, with authority to make the arrangement, and the testimony of Nelson (the import of which is for you) should satisfy you that their understanding was, that Joseph consented to the arrangement, in case the blooms were there for his father, and he found there were none—*no consideration for* a release passed, and the defence would fail.    The witness says they parted with the understanding that this lot of blooms, which was at Water Street, should be taken in place of that sent to Pittsburgh.    Did Joseph Moore make this arrangement, on the condition that the blooms were at Water Street for him; and if he did, were there any blooms there for him?    These are questions of fact for you, and as you find the facts, you will apply them to the principles which we have stated govern the case."

The jury found for the defendant, and the court below entered judgment upon the verdict.

The plaintiffs purchased this writ, and assigned here for error:—

That the court below erred in admitting the deposition of Nelson.    In permitting him to prove conversations between himself and Hammond, and between himself and Joseph Moore, without proof of Joseph's agency.    In their answers to the plaintiff's points, and in the general instructions above quoted.

*Orbison* and *Calvin,* for plaintiffs in error.

*Banks,* and *A. P. Wilson,* for defendant in error.

The opinion of the court was delivered by

ARMSTRONG, J.—Henry L. Patterson was a common carrier on the Pennsylvania Canal and Railroad.    In the fall of 1841 he received on board his canal boats 1577 blooms for Robert Moore, to be delivered at Pittsburgh.    The next season, 1842, it was discovered that 430 of the blooms never reached the consignee of Moore, and were never delivered for him; but when at Patterson's wharf, at Hollidaysburg, his clerk changed the manifest and forwarded them for Hileman & Hammond, who had no control over them.    The law holds every common carrier intrusted with goods as responsible at all events for every injury arising in any other way but from the act of Providence or the common enemy.    On the facts stated Patterson was unquestionably liable for the amount of blooms not delivered, from which he could only be relieved by

a release or other sufficient discharge. In defence, the counsel of Mr. Patterson offered in evidence the deposition of William Nelson, his clerk. It was objected to by the plaintiff on the ground that he was the agent of Patterson, who was sued for negligence, and to whom he might be liable. The admission of this was the first error assigned. His situation as clerk merely, did not render him incompetent; and there was nothing in the evidence fixing such a liability on him as would justify his exclusion. This error is not sustained.

The defence set up was that in the summer of 1842, Robert Moore paid the balance of freight due on the blooms actually delivered; and that in that year an arrangement was made between defendant's clerk, and a minor son of Moore, and Hileman & Hammond, that Moore should have other blooms at Water Street in lieu of 430 missing. To make this proof the deposition of William Nelson, the clerk, was admitted. It was objected by the plaintiff that conversations between Joseph and Hammond, and the arrangement between them, were not evidence to affect Robert, unless a previous authority was shown in Joseph to act, or that his acts were afterwards ratified by his father. The act of an agent, within the scope of his authority, is the act of the principal. But "a party who avails himself of the act of an agent must, in order to charge the principal, prove the authority under which the agent acted. The burden of the proof lies on him to establish the agency and the extent of it:" Hays & Wick *v.* Lynn, 7 *Watts* 525. Had Joseph been first proved to be the agent of his father for this purpose, then his acts, and the arrangement referred to with Hammond, might have exonerated Patterson, if made on proper consideration and carried out in good faith. "But before such facts can be given in evidence, the fact of agency must be proved." Yet, as courts cannot always direct the order in which evidence shall be offered, it may have been thought that proof of ratification would follow (and this remark may be applied to the second error assigned).

Acts alone are not proof of agency. If they were, every man's business might be interrupted or deranged by the interference of strangers. There is not a word in Nelson's deposition to show that Robert Moore was cognisant of what his son had said or done. The court say, in answer to plaintiff's 2d point, "There is not evidence to show that there was any authority in Joseph Moore to authorize a release, nor is there anything said or done by him to be treated or regarded as such release that would be binding on Robert Moore, unless the evidence satisfies you that Robert Moore afterwards ratified what Joseph did, and that he agreed to take the blooms at Water Street, as represented by Nelson in his deposition, and to release Patterson from his liability. Patterson was clearly liable for the 430 blooms when Joseph went to him. There

[Moore's Executors *v.* Patterson.]

is not evidence to show that he went with authority to release the liability. *Does the evidence show that he afterwards ratified an act of his son releasing him? This is a question for you.*" This answer affirms the position taken by the plaintiff in this point, as to the authority of Joseph to release; and puts the whole on the question of subsequent ratification by his father. Now, where is the evidence of ratification? It was proved that Robert Moore paid Patterson the freight on 1147 pieces which were delivered. This he had a right to do. It was at his option to set up the damage for non-delivery of blooms against the demand for freight, or to pay it, and make his claim for the blooms a distinct matter, to be adjusted afterwards. The receipt of Mr. Patterson for freight can have no effect one way or the other, beyond what is expressed on its face.

Nelson says he "never had any conversation with Mr. Moore, it was all with his son." There was not only no proof of precedent authority to the son, but there was no evidence that the conversation between him and Hammond and Nelson was ever communicated to the father, nor of any action of the father pursuant to such conversation. And John T. Horrell proves that "Joseph Moore did not claim any iron at Water street for his father when he came back, as left there for him by Hileman & Hammond, in place of the 430 lost—had no orders from them at any time to ship any blooms for Mr. Moore, lying (as they had told Joseph) at the lower end of our wharf. We had no blooms of theirs in the spring of 1842, but fifty-nine pieces and a lot weighed off of theirs before for the Messrs. Bell."

If the conversation with Hammond and Nelson, which was only executory, had amounted to a release of Patterson, it would have failed for want of consideration, if no blooms were at the place appointed to meet the arrangement. It has often been decided that, "it is error to permit a jury to pass upon a matter of fact of which there was no evidence:" 8 *Watts* 385; 6 *Watts* 72, 487; 1.*Barr* 68. And in Stauffer *v.* Latshaw, 2 *Watts* 165, it was held that, "to submit a fact, destitute of evidence, to the determination of a jury, as one that may nevertheless be found, is an encouragement to err, which cannot be too closely observed or unsparingly corrected." The record before us presents no evidence which would authorize the court to submit to the jury as a matter of fact, the question whether Robert Moore ratified the acts of his son, which were alleged to be a release of Patterson. There was, therefore, error in this particular, in the answer to the plaintiff's 2d point.

The 4th and 5th errors assigned apply to the 3d and 4th points of plaintiff. I am not prepared to say that the answers to these points, as they were put to the court, were wrong. If Joseph *was* the agent of his father, as the 3d assumes, then there

[Moore's Executors *v.* Patterson.]

was some evidence, the effect of which was to be determined by the jury. The answer to the 3d point is not so indirect as to amount to error. The court say that if the arrangement·was made with authority from his father, but on condition that Hile- · man & Hammond had the blooms at Water Street for his father, and would furnish them there, and had not done so, Henry L. Patterson would still be bound. In this there is nothing to complain of, as it is rather an affirmance of the point.

What has been said in relation to the 2d and 3d errors, will apply to the 6th. If Robert afterwards sanctioned and agreed to the arrangement made by his son, of course it would be binding according to its terms—if complied with. I have already said there was no evidence of such sanction or ratification. As there was some evidence before the jury, I do not think it safe to say that the 7th error is sustained. It was for them under proper instructions, rather than the court, to say how far the facts went to establish a release of Patterson, which after all would go for nothing if not ratified by Moore.

Judgment reversed and *venire de novo* awarded.