# CHARLESTON.

Kelly Convertible Wagon Company *v.* Rhodes Manufacturing Company *et al.*

(No. 5546)

Submitted May 18, 1926.  Decided May 25, 1926.

(Rehearing Denied November 12, 1926.)

1. Corporations—*The President of a Corporation Has No Inherent Power to Make Contracts on its Behalf.*

   The president of a corporation has no inherent power to make contracts on its behalf.  (p. 18.)
   (Corporations, 14a C. J. § 2272.)

2. Same—*Implied Authority of General Manager of Corporation Extends Only to Such Matters as Come Within Scope of Ordinary Business.*

   The implied authority of a general manager of a corporation extends only to such matters as come within the scope of its ordinary business.  (p. 18.)
   (Corporations, 14a C. J. § 2211.)

3. Estoppel—*To Estop Corporation by Its Conduct From Denying Authority of Its Officers or Agents, One Seeking to Enforce Estoppel Must Show That He Was Misled to His Injury by Words, Acts or Conduct of Other Party While Ignorant of Own Rights and Without Knowledge of Facts.*

   To estop a corporation by its conduct from denying the authority of its officers or agents, the one seeking to enforce the estoppel must show that he was misled to his injury by the words, acts or conduct of the other party while ignorant of his own rights and without knowledge of the facts. (p. 19.)
   (Corporations, 14a C. J. § 2229.)

   (Note: Parenthetical references by Editors, C. J.—Cyc. Not part of Syllabi.)

Appeal from Circuit Court, Cabell County.

Suit by Kelly Convertible Wagon Company against Rhodes Manufacturing Company.  Judgment for plaintiff, defendant appeals.

*Part of decree appealed from reversed.*

*J. M. Rigg,* for appellee.
*T. W. Peyton* and *E. L. Hogsett,* for appellant.

MILLER, JUDGE:

The defendant below prosecutes this appeal from a decree of the circuit court of Cabell County.

By its bill in equity plaintiff alleged that it was the owner of the exclusive right to manufacture and sell a certain patented device called ''The Kelly Skipper, a convertible vehicle or wagon;'' that the defendant represented it was in a position to manufacture and sell said vehicle on a royalty basis; that by a written contract made June 2, 1923, plaintiff assigned to defendant all its right, title and interest in said vehicle, and that defendant agreed to manufacture at least 10,000 wagons each six months, beginning January 1, 1924, and to sell them at a minimum price of $6.00 each, and pay plaintiff 15% of the gross receipts of all sales; that defendant had not manufactured any of the vehicles as agreed; that defendant had announced its intention to sell and dispose of all its property; that it was insolvent, and if permitted to dispose of its property, plaintiff would be greatly and irreparably injured. The bill prayed that defendant be required to disclose the amount of its property; that it be restrained from using the proceeds of any sale thereof for any purpose that would prejudice plaintiff's rights; that a special receiver be appointed; and that plaintiff be decreed the amount due it under the royalty contract.

Defendant's answer denied that it was in a position to manufacture the Kelly vehicle on a royalty basis; and alleged that it was incorporated for the sole purpose of manufacturing the ''Rhodes Barrel Jack,'' and that its president, G. O. Rhodes, had no authority to enter into the contract pleaded by plaintiff; that defendant had not received any benefit from the contract, and had done no act which would in any wise appear to be a ratification of said contract, or that it owed plaintiff any amount thereon; and that it was not insolvent according to the usual meaning of the term.

The defendant corporation was organized March 24, 1923, by the adoption of by-laws and the election of a board of directors. On the same day, at a meeting of the directors, G. O. Rhodes was elected president and general manager, and

C. W. Beckner, secretary. It appears that no later meetings of stockholders or directors were ever held. The corporate charter is not exhibited with the record, but the original stockholders' subscription list recites only: "Application has been made to the Secretary of State to issue charter to the Rhodes Manufacturing Company, Huntington, West Virginia, with an authorized capital of $50,000.00 divided into 500 shares of $100.00 each for the purpose of manufacturing the Rhodes Patent Barrel Jack." It appears that twelve stockholders subscribed for $27,000.00 in stock, ten of whom paid in $9,700.00. No later payments on stock were made. Rhodes was to have $15,000.00 in stock for his patent.

The contract in question was signed for plaintiff by its president, J. I. Kelly, and for defendant by G. O. Rhodes, President.

The commissioner to whom the cause was referred, on the depositions and exhibits filed, found that defendant was bound by the contract, and that plaintiff was entitled to the sum of $10,920.49, royalties under said contract. The circuit court overruled defendant's exceptions to the commissioner's report, and confirmed the same as submitted.

It is not contended that Rhodes as president or as general manager had specific authority to enter into the contract sued on, or general authority to contract for defendant, conferred by affirmative action of its board of directors.

As president of the defendant corporation Rhodes had no inherent power to make contracts on its behalf. *Varney & Evans* v. *Lumber Company,* 70 W. Va. 169; 21 Am. & Eng. Enc. Law, 857; 2 Thompson on Corporations (2nd ed.), § 1464; 4 Cook on Corporations (8th ed.), § 716; 3 Page on Contracts (2nd ed.), § 1797.

While the general manager of a corporation is by law vested with greater powers in regard to making contracts than the president, his inherent authority to contract for his principal "extends only to such matters as come within the scope of its ordinary business." *Carroll-Cross Coal Company* v. *Abrams Creek Coal & Coke Company,* 83 W. Va. 205; 2 Thompson, § 1577; 4 Cook, § 719; 1 Mechem on Agency (2nd ed.), §§ 980-981. What was the ordinary business of the de-

fendant corporation? There is not a particle of evidence to show that it was engaged in any other business than the manufacture of The Rhodes Barrel Jack before the time the contract in question was made. And there is no evidence that any of the directors or other stockholders contemplated the manufacture of any other article, except that Beckner knew Rhodes and Kelly were considering an arrangement of some kind in regard to Kelly's wagon. Considering the nature of the business defendant was engaged in, Kelly could not have been misled as to Rhodes' authority, so far as the scope of his company's ordinary business was concerned. Kelly testified that he was at defendant's plant frequently, from the time the construction work began until after it went into the hands of a receiver. The contract of June 2, 1923, could not have been within the ordinary scope of defendant's business. Only two men besides Rhodes had been employed in the plant. To comply with the Kelly contract, the manufacture of 20,000 sled-wagons a year, would have meant a complete change in the plant and machinery, as well as in the nature and scope of defendant's former business. And it is not to be presumed that Rhodes' authority as general manager could be extended to making contracts rendering his principal liable for minimum royalties of $18,000.00 per year for a period of seventeen years, and especially so considering the limited capital and equipment. No director or stockholder could reasonably have anticipated such a contract at the time of his employment; and Kelly had notice of defendant's limited scope of business.

On this appeal plaintiff relies mainly on the proposition that defendant is estopped to deny authority in Rhodes to make the contract sued on. It is contended that the evidence shows he was given sole and absolute control of all the affairs of the company, and was in fact its sole proprietor; that he made all the contracts, built and operated defendant's plant, employed workmen, and paid out money, all with the assent of the company's stockholders and directors; and that after the wagon contract was entered into, no objection was made by any director or stockholder, and that a number of them knew of the same.

Kelly could not have been misled by acts of Rhodes before the date of the contract. The fact that the latter superintended the construction of defendant's plant, and employed men to work on the construction and afterwards in the manufacture of barrel jacks, did not imply power and authority to enter into a contract changing the apparent nature and scope of the business entrusted to him by his employer. In fact Kelly did not testify that he was induced to make the contract through Rhodes' apparent authority inferred from acts in the conduct of the business. The evidence of what acts of authority Rhodes did exercise only amounts to what appears to have been necessary in preparing for the manufacture of barrel jacks and in manufacturing them.

Thus it appears that when the contract was entered into, Kelly was charged with knowledge that Rhodes had no lawful authority to make a contract changing the whole scope of defendant's business and obligating it for a period of seventeen years to pay enormous royalties on a new and untried venture. Then how was plaintiff misled to its prejudice?

Much is said about knowledge and acquiescence on the part of defendant's directors and stockholders. But knowledge of what? It appears that Beckner had some knowledge of the contract. He attended a conference with Rhodes, Kelly and another of plaintiff's stockholders before the contract was closed, and apparently approved the taking over of the Kelly patent. He said he did not think any of the other directors knew of the contract, though perhaps two of them knew there was some kind of a working arrangement between Kelly and Rhodes. Just what knowledge was brought to the attention of any other stockholder or director before the trouble between the parties arose, does not appear. And it does not appear that anyone, except Rhodes and Beckner, had knowledge of an arrangement between Rhodes and Kelly before Beckner was made trustee, in February, 1924. How could the directors acquiesce in a contract of which they knew nothing? If some of them did know that there was some kind of a working arrangement between Rhodes and Kelly and were acquainted with the work going on at the plant, they would have seen that Rhodes and another employee, Bowles,

were experimenting with models of a sled-wagon, trying to perfect them in an effort to make an article that could be manufactured at a profit; and certainly that would not be notice of a binding written contract to manufacture for another a specific article already designed and patented, but the contrary. Kelly testified that not one of his vehicles was made in the plant. His complaint is that Rhodes and Bowles were working on another wagon, similar in character to his, and were neglecting his patented article, in violation of his contract. It appears that Rhodes did purchase some machinery and construct dies to be used in the manufacture of a sled-wagon, but Kelly testified that not one of the dies was designed to be used in the manufacture of his wagon.

Little could have been done under Rhodes' management, for Beckner was appointed trustee in February, 1924, less than two months after the work on the contract was to commence. Beckner had no authority to ratify the contract as a director and secretary of the company, and his authority as trustee seems to have been only to wind up the affairs of the corporation and sell the property, though it appears he made some effort to put the business back on its feet again.

"To estop a corporation by its conduct from denying the authority of its officers and agents, the one seeking to enforce the estoppel must have been misled thereby to his injury." *Lawrence* v. *Montgomery Gas Co.*, 88 W. Va. 352, and cases cited; 4 Fletcher's Cyc. Cor. § 2195. "One claiming a right by estoppel must show that he has been misled by the words, acts or conduct of the other party, while ignorant of his rights. He must be governed by his own knowledge, even though a representation to the contrary may have been made by the other party. In other words, he must have been misled to his injury, and it is impossible that he should have been, when he was fully informed as to the facts." *Carroll-Cross Coal Co.* v. *Abrams Creek Coal & Coke Co., supra.* And where the corporation has taken no affirmative step, has received no benefit, and the other contracting party has suffered no injury, mere delay in repudiating the attempted contract may not bind the corporation. *Blum* v. *Whipple*, 194 Mass. 253, 13 L. R. A. (N. S.) 211, 120 Am. St. Rep. 553. Who

knew more about the actual facts than Kelly? He admits he visited the plant often. He knew that little, if anything was being done preparatory to manufacturing his wagon, and that Rhodes and Bowles were working on improvements to his patent. He was not ignorant of his rights, and if violated, he knew they had been violated from the beginning. Defendant gained nothing by the contract; in fact it lost. For some reason plaintiff preferred to sell or assign its patent right, rather than to manufacture the patented article itself. By a royalty contract it had everything to gain and nothing to lose. Then, how was it injured in view of Kelly's knowledge of all the facts? Our opinion is that plaintiff was not misled to its injury by any act or failure to act on the part of defendant's directors or stockholders.

Plaintiff's counsel argue that the finding of the commissioner, confirmed by the court, carries the presumption of correctness. In addition to the amount of plaintiff's claim, the only findings of the commissioner were that Rhodes had full power to execute the contract in question, and that it was defendant's "own fault if it did not profit from the Kelly Convertible Wagon contract which it now seeks to evade." The order of the court recites no finding of fact, but simply confirms the report of the commissioner. These findings amount to mere conclusions of law, not entitled to the weight given findings of fact by a commissioner or the trial court.

The order of the circuit court referring the cause to the commissioner directed him to ascertain, in addition to what amount was owing from defendant to plaintiff, what other debts were owing from defendant, and to whom and the amounts and by whom remained unpaid on subscriptions to capital stock in the defendant corporation; and what property and other assets it owned. The commissioner reported fully on these matters. Defendant's petition for appeal seeks relief only from the finding in favor of the Kelly Convertible Wagon Company.

Our conclusion is to reverse the decree of the circuit court in so far as the same overrules defendant's exceptions to the commissioner's report finding in favor of the plaintiff the Kelly Convertible Wagon Company, and to sustain said ex-

ceptions. Plaintiff's bill, in so far as it seeks relief on the contract of June 2, 1923, will be dismissed. In all other respects the decree appealed from will be affirmed.

*Part of decree appealed from reversed.*