C. M. MEANS *v.* SOUTHEASTERN GAS COMPANY

(No. 7298)

Submitted February 15, 1933. Decided March 21, 1933.

(Rehearing denied June 15, 1933)

*Koontz, Hulbutt & Revercomb* and *Brown, Jackson & Knight, White & Case, Glover C. Johnson,* and *Lon H. Kelly,* for plaintiff in error.

*Lively & Stambaugh* and *Maurice J. Crocker,* for defendant in error.

HATCHER, JUDGE:

The plaintiff, C. M. Means, recovered a judgment in the circuit court against the defendant, Southeastern Gas Com-

pany, (a West Virginia corporation) for the debt of another corporation, and a writ of error followed.

The Jervian Corporation (a New York corporation) acquired an option to purchase "the equity of the stock" of Tennessee Oil & Gas Company and agreed in the option to advance the Tennessee company sufficient money for it to drill three gas wells. The Jervian Corporation was owned exclusively by E. R. Diggs & Company of New York City. The Southeastern was not controlled by the Diggs company, but the entire stock of Southeastern was held by Inland Utilities Company (a Delaware corporation) which was owned by the Diggs company and sixteen other banking houses. J. E. Kelly, acting for the Jervian corporation, requested John Young, field superintendent for the defendant, who was then serving Jervian temporarily in the same capacity, to recommend a driller for the Tennessee work. Young had known the plaintiff for some time and recommended him. After some negotiations he entered into a written contract on January 24, 1930, directly with the Tennessee company to drill the wells. Plaintiff testified that when the contract was presented to him he told Young that he knew nothing about the Tennessee company and would have to be guaranteed his money for the drilling, to which Young replied: "We have an option on this property and we will guarantee your money." (Means says he had known Young as the superintendent of Southeastern and inferred that by "we" he meant Southeastern. Young says the "we" meant "the E. R. Diggs banking house" for whom he was working at that time.) Young referred plaintiff to Kelly, who gave the following guaranty on June 4, 1930:

"Mr. C. M. Means,
   Charleston, W. Va.
Dear Sir:
   With reference to the contract entered into on January 24th, between C. M. Means and the Tennessee Oil and Gas Company, providing for the drilling of certain wells in Tennessee and the payment therefor, the Jervian Corporation will pay or cause to be paid at the time and in the manner set forth in the said contract, sums due to you by the said Tennessee Oil and Gas Company.
                    Yours very truly,
              (s) JOHN EOGHAN KELLY"

Means testified that when the above guaranty was tendered him, he had the following conversation with Kelly (denied by Kelly): "I told him I knew nothing of the Jervian corporation and he told me I was working with the Southeastern Gas Company. He said 'They are just acting as agent or go-between between the Southeastern Gas Company and Diggs and the Southeastern Gas Company is responsible to you for your money.'" Means then proceeded with the drilling. Not being paid therefor, and the Jervian becoming bankrupt, Means conferred with Kelly about the middle of February, 1931, and he testified as follows concerning that conference: "We was talking about the Southeastern Gas Company and I asked him why I could not collect off the Southeastern; and also of course the Jervian proposition came up. He said 'The Jervian corporation never was intended to own anything or owe anything. If you are able to fight it I don't see any reason why they could beat you.'" (Kelly also denied this conversation.)

The Southeastern owned a number of properties, all of which (with possibly one exception) were obtained through Jervian. Kelly was vice-president of Southeastern while he was representing the Diggs company and Jervian. Southeastern lent its field superintendent Young to Jervian while the Tennessee property was being prospected. Those circumstances demonstrate that a very close relationship existed between the Jervian (entirely Diggs) and the Southeastern (sixteen others and Diggs through Inland). Plaintiff is entitled to the benefit of this background of intercorporate relations in having his case determined, despite denials by both Young and Kelly that Southeastern had any interest in the drilling of the Tennessee property.

The brief for Means takes the following positions: "(1) That Kelly as vice-president and in active charge of field operations of the Southeastern executed the guaranty as the agent of the Southeastern, or (2) that the Jervian acting through its sole agent, Kelly, executed the guaranty as agent of the Southeastern."

(1) There is no evidence whatsoever supporting the first position. Kelly was not in active charge of field operations for Southeastern on June 4, 1930, when the guaranty was

executed, though he was then its vice-president. He had been in active charge of Southeastern prior to 1930, but on January 1, 1930, he was superseded in that capacity by a Dr. Bray, and Kelly then became the representative of the Diggs company and Jervian. "John Eoghan Kelly—Jervian Corporation" was lettered on the door of Kelly's office. Means had never met Kelly prior to the final verbal agreement relative to the Tennessee drilling, which was after he ceased to be in charge of Southeastern. Means says that Young had told him "before" that Kelly was superintendent of the Southeastern, but Means admits that Kelly was introduced to him by Young merely as vice-president of Southeastern. Therefore, Means was not misinformed as to Kelly's official connection with Southeastern during negotiations with him. Kelly testified (a) that he had no authority from Southeastern to execute the guaranty for it, and (b) that he executed the guaranty for Jervian on the express instruction of his "client", Mr. Diggs. The foregoing is not controverted, and is not inconsistent with the written guaranty which is specifically the guaranty of Jervian. The office of vice-president gave Kelly no inherent power to contract at all for Southeastern, much less to bind it for the debt of another. 14a C. J., subject Corporations, sec. 2273; *Wagon Co.* v. *Mfg. Co.*, 102 W. Va. 16, 135 S. E. 242.

(2) It is not shown that Kelly was still an officer of the Southeastern in February, 1931, when he allegedly told Means that "they" (Southeastern, according to Means) were responsible to him. Even if Kelly were an officer then, that statement would be merely his opinion and would not bind the Southeastern. Consequently, in the final analysis, plaintiff's case against the Southeastern rests on the oral representation alleged to have been made by Kelly at the time he gave to plaintiff the written guaranty of the Jervian corporation, to-wit: "They (Jervian) are just acting as agent or go-between the Southeastern Gas Company and Diggs and the Southeastern Gas Company is responsible to you for your money." If this statement be considered as that of Jervian (speaking through Kelly) then it was a declaration for the purpose of establishing that Jervian was the agent of another and was inadmissible. "Admissions and declarations of a

person claiming to be an agent of another are not admissible as evidence to prove such agency." *State* v. *Brewing Co.*, 74 W. Va. 232, 81 S. E. 974. *Rosendorf* v. *Poling*, 48 W. Va. 621, 37 S. E. 555; *Garber* v. *Blatchley*, 51 W. Va. 147, 41 S. E. 222; *Weimer* v. *Bourn*, 103 W. Va. 530, 138 S. E. 101; Mechem, On Agency (2d Ed.), sec. 284. If the statement be regarded as having been made from information obtained by Kelly through his connection with Southeastern, and be accepted even as proof that Jervian *was in fact* an agent or go-between of the Southeastern and Diggs, that proof is not sufficient to sustain the recovery against Southeastern in that it does not show *the extent of Jervian's authority* as such agent or go-between. ''An agent must be proven to have the power to do the act in question.'' *Grafton* v. *Davisson*, 45 W. Va. 12, 29 S. E. 1028. *Moore's Ex.* v. *Patterson*, 28 Pa. 505; *Rumble* v. *Cummings*, 52 Ore. 203, 95 P. 1111; *Dispatch Co.* v. *Bank*, 109 Minn. 440, 124 N. W. 236; *Baker Co.* v. *Machinery Co.*, (Tex.) 84 S. W. 661; *Ames* v. *Mfg. Co.*, 114 Wis. 85, 89 N. W. 836; *Langbein* v. *Tongue*, 54 N. Y. S. 145; *Schutz* v. *Jordan*, 141 U. S. 213; 2 Ency. L. & Pl. 973; 2 C. J., subj. Agency, secs. 665 and 674; Mechem, On Agency (2d Ed.) sec. 298. We can assume from the record that there was some kind of understanding or arrangement between Diggs and his sixteen associates in the Inland Company whereby Diggs should acquire gas properties in the name of Jervian and then have it transfer the properties to the Southeastern. We can also assume that the Southeastern was interested in the very option Jervian had on the Tennessee property, with a purchase thereof in contemplation. But further postulation is not warranted, and the above assumptions do not imply any authority in Diggs or his corporation, the Jervian, to bind the Southeastern by a Jervian contract. The details of the agreement or understanding between Diggs and his sixteen associates in the Inland company relative to the Southeastern and the Jervian are lacking. There are so many kinds of agents and ''go-betweens'' with multiple degrees of power that we cannot presume in the absence of definite evidence, that Jervian had specific authority from the Southeastern to guarantee for it such contracts as the one with Means. ''Authority of an agent * * * to obligate his principal to pay the debt of another, is not

to be inferred, without clear evidence that it has been granted." *Owens Co.* v. *Trust Co.*, 259 Fed. 838.

If the alleged declaration of Kelly to Means that "the Southeastern Gas Company is responsible to you for your money" is to be taken as a promise that Southeastern would pay Means, it is ineffectual for want of authority; if it is to be taken as an opinion, or as a declaration of agency, it is inadmissible.

Means has taken several positions not in harmony with his present demand; but further comment is unnecessary since he has not shown a prima facie right to recover of Southeastern.

The judgment below is reversed, the verdict set aside, and a new trial awarded the defendant.

*Reversed; verdict set aside; new trial awarded.*

ON PETITION TO REHEAR:

Code, 56-4-46, provides that when a pleading alleges "that any person made * * * any writing, it shall not be necessary to prove such fact" unless the denial be under oath. After setting out the contract between Means and the Tennessee Company, the notice of motion alleges "and that at a later date, to-wit: on the 4th day of June, 1930, the Jervian Corporation, a corporation, by John Eoghan Kelly, its duly authorized agent or officer, acting as your agent and on your behalf executed to the undersigned the following guaranty". Then follows the letter signed by Kelly purporting to bind the Jervian. The defendant plead the general issue without verifying it. Counsel for Means stress the position that by virtue of the statute, it was not necessary to prove the allegation that the Jervian was the agent of defendant. Considering the notice in connectnion with the statute, the "writing" is the letter of June 4th, and the "person" alleged to have executed the letter (the guarantee) is *the Jervian Corporation.* (It will be noted that the pleading does not allege *that Southeastern executed the guarantee.*) The "fact", unnecessary to have proved under the statute, is that the Jervian did execute the letter. The execution by the Jervian and the capacity in which the Jervian acted are two entirely separate

matters. The former (the execution) is a question of fact, while the latter (the agency) is a question of law. *Proof* relates to fact and not to law. It is clear that the statute applies only to a pleading of fact and not to one of law.